BULLDOG INVESTORS GENERAL PARTNERSHIP & others[1] *vs.*
SECRETARY OF THE COMMONWEALTH.

Suffolk. January 6, 2011. - September 22, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, & GANTS, JJ.

*Securities. Uniform Securities Act. Constitutional Law,* Freedom of speech and
press. *Advertising. Secretary of the Commonwealth. Words,* "Commercial
speech," "Noncommercial speech."

Discussion of the Federal Securities Act of 1933, 15 U.S.C. §§ 77a et seq.,
which prohibits general solicitation and advertising by anyone offering
unregistered securities [652-655], and of the Massachusetts Uniform Securi-
ties Act, which largely tracks the requirements of Federal securities law
[655-656].

In a civil action brought in Superior Court by plaintiffs alleging that Federal
and State securities laws that prohibited general solicitation and advertising
by anyone offering unregistered securities were overbroad and violated
constitutional free speech rights, the judge did not err in concluding that
the challenged statute, regulations, and enforcement action against the
plaintiffs did not violate the First Amendment to the United States Constitu-
tion, where, although the plaintiffs' communications concerning financial
products, management, and investment philosophy were speech protected
by the First Amendment [656-658], they plainly constituted commercial
speech [658-660] properly subject to a disclosure scheme that not only was
reasonably related to the State's interest in promoting the integrity of
capital markets by ensuring that investors make decisions based on full
and accurate information [660-668], but also directly advanced that
substantial government interest and were not more extensive than was
necessary to serve that interest [668-676]; further, the enforcement of the
challenged provisions did not constitute an independent First Amendment
violation of the right of an investor to receive information [678-681].

There was no merit to a claim that certain State and Federal securities regula-
tions restricted fully protected, noncommercial speech in violation of the
First Amendment to the United States Constitution, where the challenged
provisions restricted the speech of an issuer of securities only where it was
designed to solicit an offer to purchase securities, a prohibition that did not
include a substantial amount of noncommercial speech relative to the
plainly legitimate sweep of the provisions. [676-678]

[1]Opportunity Partners, L.P.; Full Value Partners, L.P.; Opportunity Income
Plus Fund, L.P.; Kimball & Winthrop, Inc.; Full Value Advisors, LLC; SPAR
Advisors, LLC; Phillip Goldstein; Steven Samuels; Andrew Dakos; Rajeev
Das; and Leonard Bloness.

CIVIL ACTION commenced in the Superior Court Department on March 23, 2007.

The case was heard by *Judith Fabricant*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Laurence Tribe* (*Alan S. Lewis*, of New York, & *Andrew Good* with him) for the plaintiffs.

*Pierce O. Cray*, Assistant Attorney General, for the defendant.

*Lee Tien* & *Adam Kessel*, for John Berlau & others, amici curiae, submitted a brief.

GANTS, J. On January 31, 2007, the Enforcement Section of the Securities Division of the office of the Secretary of the Commonwealth (Secretary) filed an administrative complaint alleging that three "hedge funds" offered by Bulldog Investors General Partnership operating under the trade name "Bulldog Investors" had violated § 301 of G. L. c. 110A of the Massachusetts Uniform Securities Act (Massachusetts act) by offering unregistered securities to a Massachusetts resident through a publicly available Web site and an electronic mail (e-mail) message. The respondents to this enforcement action included the Bulldog Investors General Partnership and various general partners and principals (collectively, Bulldog).[2] The Secretary adopted the hearing officer's finding of a violation and ordered Bulldog to cease and desist from committing any further violations of the Massachusetts act and to take all necessary actions to ensure that future offers and sales of securities complied with § 301 of the Massachusetts act.[3]

---

[2]Among the general partners of Bulldog Investors General Partnership are the plaintiffs Opportunity Partners, L.P.; Full Value Partners, L.P.; and Opportunity Income Plus Fund, L.P., each of which is a hedge fund. The plaintiff Kimball & Winthrop, Inc., is the sole managing general partner of Bulldog Investors General Partnership and the sole general partner of Opportunity Partners, L.P. The plaintiff Full Value Advisors, LLC, is the sole general partner of Full Value Partners, L.P. The plaintiff SPAR Advisors, LLC, is the sole general partner of Opportunity Income Plus Fund, L.P. The plaintiffs Phillip Goldstein, Steven Samuels, Andrew Dakos, and Rajeev Das are each managing members of one or more of the above named limited liability corporations. In addition, Goldstein is president and Samuels is vice-president of Kimball & Winthrop, Inc. Each of these entities and individuals (collectively, Bulldog) was a respondent in the January 31, 2007, administrative complaint.

[3]The Secretary of the Commonwealth (Secretary) also ordered Bulldog to pay

Bulldog filed two actions challenging the administrative decision. One action sought judicial review pursuant to G. L. c. 30A, § 14, claiming that Bulldog's contacts with the Commonwealth were insufficient to permit the Secretary to exercise personal jurisdiction, that Bulldog's communications with the Massachusetts resident did not offer unregistered securities in violation of the Massachusetts act, and that the Secretary's enforcement proceeding and order violated Bulldog's constitutional right to free speech. See *Bulldog Investors Gen. Partnership* v. *Secretary of the Commonwealth*, 457 Mass. 210, 213-214 (2010) (*Bulldog I*). The second action, the case now before us on appeal, sought relief under the Federal civil rights statute, 42 U.S.C. § 1983 (2006), from what Bulldog contends was the violation of free speech and due process rights guaranteed under the First and Fourteenth Amendments to the United States Constitution. Leonard Bloness, who has no interest in investing in any Bulldog security but wishes to read the information that was contained in Bulldog's Web site and receive other information about Bulldog's securities, is also a plaintiff in the § 1983 action.

In the G. L. c. 30A, § 14, action, a judge in the Superior Court entered judgment affirming the Secretary's final order, and we affirmed that judgment, concluding that personal jurisdiction over the plaintiffs was both statutorily authorized and consistent with due process, and that the Secretary correctly determined that the plaintiffs violated the Massachusetts act by sending to a Massachusetts resident materials that constituted an offer of unregistered securities. *Bulldog I, supra* at 211. We also concluded that Bulldog's First Amendment claim was not properly before us where the plaintiffs had chosen to bring a separate § 1983 action in order to raise that claim, rather than press it in their G. L. c. 30A, § 14, action. *Id.* at 211, 220.

In the § 1983 case, the judge dismissed the plaintiffs' due process claims, which were based on a claimed lack of personal jurisdiction, and conducted a bench trial on the First Amendment claims. The evidence at trial consisted of the parties' stipulations of fact; the administrative record and other agreed-on

an administrative fine of $25,000, the maximum allowable under § 407A (*a*) of G. L. c. 110A, the Massachusetts Uniform Securities Act (Massachusetts act).

exhibits; and the testimony and report of the Secretary's expert witness, Joseph A. Franco, an expert on securities regulation. In a carefully reasoned decision, the judge concluded that the challenged statute, regulations, and enforcement action did not violate the First Amendment rights of Bulldog or Bloness, and the judge entered judgment for the Secretary. The plaintiffs appealed, and we transferred the appeal to this court on our own motion. We now affirm.[4],[5]

I. *Factual background.* The following facts were found by the judge or are undisputed in the record. From about June 9, 2005 to January 5, 2007, Bulldog maintained an interactive Web site that provided information about its investment products. Any visitor to the Web site could view an opening home page, a "press room" containing links to various media articles, and a printable brochure that described the three hedge funds and gave a brief summary of each fund's approach to investment. For example, one of the hedge funds, Full Value Partners, L.P., was described in the brochure as "a fund that concentrates on taking substantial positions in undervalued operating companies and closed-end mutual funds [and] acts as a catalyst to 'unlock' these values through proprietary means." The brochure also stated that, "[s]ince its inception, Bulldog Investors has delivered a net average annual return significantly higher than that of the S&P [Standard & Poor's] 500 Index. Moreover, Bulldog has performed especially well in difficult investment periods like 2000 through 2002."

A visitor to the Web site could obtain additional information only by clicking the "I Agree" button to the following disclaimer on the opening screen:

> "The information is available for information purposes only and does not constitute solicitation as to any investment service or product and is not an invitation to subscribe for shares or units in any fund herein. For the avoidance

---

[4]We do not consider again the plaintiffs' personal jurisdiction arguments, which were resolved in favor of the Secretary in *Bulldog Investors Gen. Partnership* v. *Secretary of the Commonwealth*, 457 Mass. 210, 219 (2010) (*Bulldog I*).

[5]We acknowledge the amicus brief submitted by John Berlau, James Mc-Ritchie, Antony Page, Andrew Weinman, and Deirdre Brennan.

of doubt this Web site may not be used for the purpose of an offer or solicitation in any jurisdiction or in any circumstances in which such offer or solicitation is unlawful or not authorized. Whilst every effort has been made to ensure the accuracy of the information herein, Bulldog Investors accepts no responsibility for the accuracy of information, nor the reasonableness of the conclusions based upon such information, which has been obtained from third parties. The pages referring specifically to investment products offered by Bulldog Investors are only available for view with a username and password, which can be obtained by contacting the company on the Registration Form provided. The value of investments and the income from them can fall as well as rise. Past performance is not a guarantee of future performance and investors may not get back the full amount invested. Changes in the rates of exchange may affect the value of investments."

A follow-up screen invited the visitor to fill out a registration form that asked for the visitor's name, address, telephone and facsimile machine numbers, and an electronic mail (e-mail) address. This registration page contained the same disclaimer as appeared on the opening screen of the Bulldog Web site, and the visitor was once again required to indicate agreement.

On November 10, 2006, Brendan Hickey registered on the Bulldog Investors Web site by providing this information, including his Massachusetts address. Shortly after Hickey's registration, Steven Samuels, one of the managers of Bulldog Investors, sent an e-mail to Hickey that contained several attachments. Samuels's e-mail thanked Hickey for his interest in Bulldog and stated:

"While we are proud to have one of the best long term records in the business, it is very difficult to adequately describe what, why, and how we do what we do in a quick response to an email inquiry. . . . I have attached some basic information on our management including performance and philosophy. I would be more than happy to spend a few minutes on the phone if you wish to discuss in more detail. Please contact me at [telephone number provided]."

The attachments to Samuels' e-mail included press articles, a

presentation about Bulldog's investment philosophy, managers, investment vehicles, and performance, and a letter to "Dear Partner" from two fund managers. The letter compared one hedge fund's returns to the S & P 500, described several of the fund's investments, and discussed successful litigation by fund managers against the Securities and Exchange Commission (SEC). The parties have stipulated that, but for the administrative proceeding and the sanctions imposed, Bulldog would provide other Massachusetts residents, including Bloness, with access to the same type of information that was available to Hickey through the Web site and e-mail communication.

II. *The Federal Securities Act of 1933.* Congress enacted the Securities Act of 1933 (1933 act), 15 U.S.C. §§ 77a et seq. (2006), to address the problems that were thought to have caused the stock market crash of 1929 and the Great Depression that followed. See *Ernst & Ernst* v. *Hochfelder*, 425 U.S. 185, 194 (1976); *Securities & Exch. Comm'n* v. *Capital Gains Research Bur., Inc.*, 375 U.S. 180, 186-187 (1963). The overarching strategy of the 1933 act was to protect investors by requiring the disclosures that were necessary for informed decision-making. See *Securities & Exch. Comm'n* v. *Ralston Purina Co.*, 346 U.S. 119, 124 (1953). See also *Pinter* v. *Dahl*, 486 U.S. 622, 638 (1988); *Ernst & Ernst* v. *Hochfelder, supra* at 195; *A.C. Frost & Co.* v. *Coeur D'Alene Mines Corp.*, 312 U.S. 38, 40 (1941). As acknowledged in its preamble, the 1933 act aimed to "provide full and fair disclosure of the character of securities sold in interstate and foreign commerce and through the mails." Pub. L. No. 73-22, 48 Stat. 74 (May 27, 1933), 15 U.S.C. §§ 77a et seq. In urging Congress to enact the legislation, President Franklin D. Roosevelt explained that, while the government should not be in the business of guaranteeing the soundness of any particular security, it had an obligation "to insist that every issue of new securities to be sold in interstate commerce shall be accompanied by full publicity and information, and that no essentially important element attending the issue shall be concealed from the buying public." Message from the President — Regulation of Security Issues, presented to the Senate, 77 Cong. Rec. 937 (March 29, 1933).

Under the 1933 act, an issuer of securities may not "offer"

or sell a security unless the issuer has filed a registration statement as to that security with the SEC.[6] 15 U.S.C. § 77e(c). The registration statement must provide detailed information about the security to be offered and the issuer's management and assets, including financial statements certified by an independent accountant. 15 U.S.C. §§ 77g, 77aa.

The 1933 act defines an "offer" broadly, encompassing "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value." 15 U.S.C. § 77b(a)(3). Pursuant to the 1933 act, therefore, offers "are not limited to communications which constitute an offer in the common law contract sense, or which on their face purport to offer a security. Rather, . . . they include 'any document which is designed to procure orders for a security.' " *Matter of Carl M. Loeb, Rhoades & Co.*, 38 S.E.C. 843, 848 (1959), quoting Security Act Release No. 2623 (July 25, 1941). See *Securities & Exch. Comm'n* v. *Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *Diskin* v. *Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971). Determining whether a communication is an offer may involve "[d]ifficult and close questions of fact" and "depends upon all the facts, and the surrounding circumstances including the nature, source, distribution, timing, and apparent purpose and effect of the published material." *Matter of Carl M. Loeb, Rhoades & Co.*, supra at 853 & n.20. Because an offer includes "every . . . solicitation of an offer to buy," 15 U.S.C. § 77b(a)(3), the SEC has declared that the 1933 act "prohibits issuers . . . from initiating a public sales campaign prior to the filing of a registration statement by means of publicity efforts which, even though not couched in terms of an express offer, condition the public mind or arouse public interest in the particular securities." *Matter of Carl M. Loeb, Rhoades & Co.*, supra at 850.

The 1933 act, however, exempts certain securities and transactions from the registration requirement, including "transactions

___

[6]No offer may be made before a registration statement is filed. 15 U.S.C. § 77e(c) (2006). After a registration statement has been filed, but before its effective date, certain offers may be made, but sales must await the effective date. See 15 U.S.C. §§ 77e(b)(1), 77j (2006). See also 1 L. Loss, J. Seligman, & T. Parades, Securities Regulation 695-722 (4th ed. 2006).

by an issuer not involving any public offering," through what is known as the private offering exemption. See 15 U.S.C. § 77d(2). The meaning of this exemption has been developed through case law and SEC guidance. In *Securities & Exch. Comm'n* v. *Ralston Purina Co.*, *supra* at 124-125, the United States Supreme Court determined that the "natural way to interpret the private offering exemption is in light of the statutory purpose," and concluded that a private offering is an offer of securities to those who have no practical need for the registration statement because they have been "shown to be able to fend for themselves." In evaluating whether an offering is public or private, the courts and the SEC have considered the number of offerees, their access to information, the size or circumstances of the offering, the "sophistication" of the offerees in financial matters, and whether there is a preexisting relationship between the issuer and the offerees. See, e.g., *Securities & Exch. Comm'n* v. *Continental Tobacco Co. of S.C.*, 463 F.2d 137, 158 (5th Cir. 1972); *Securities & Exch. Comm'n* v. *Kenton Capital, Ltd.*, 69 F. Supp. 2d 1, 11 (D.D.C. 1998); Use of Electronic Media, SEC Release Nos. 33-7856, 34-42728, IC-24426, 65 Fed. Reg. 25,843, 25,852 (2000); 3 L. Loss, J. Seligman, & T. Parades, Securities Regulation 270-293 (4th ed. 2008). Because public advertising that is designed to procure orders for a security constitutes a public "offer" under the 1933 act, "[p]ublic advertising . . . would, of course, be incompatible with a claim of private offering." Non-Public Offering Exemption, SEC Release No. 33-4552, 27 Fed. Reg. 11,316, 11,316 (1962). See *Hill York Corp.* v. *American Int'l Franchises, Inc.*, 448 F.2d 680, 689 (5th Cir. 1971).

To provide more certainty than the case law offers, the SEC promulgated regulation D, which provides a safe harbor for unregistered offerings that satisfy certain conditions. See 17 C.F.R. § 230.506 (2010). Among these, an issuer relying on regulation D may offer or sell only to "[a]ccredited investors"[7] and to no more than thirty-five nonaccredited but sophisticated

_____

[7]An "[a]ccredited investor" is defined to include, among others, banks, insurance companies, registered investment companies, registered broker-dealers, and natural persons with an individual net worth exceeding $1 million or with annual income exceeding $200,000. 17 C.F.R. § 230.501(a) (2010).

investors who have "such knowledge and experience in financial and business matters that [they are] capable of evaluating the merits and risks of the prospective investment." 17 C.F.R. §§ 230.501(e), 230.506(b)(2) (2010). The regulations further provide that an issuer relying on regulation D may not "offer or sell the securities by any form of general solicitation or general advertising." 17 C.F.R. §§ 230.502(c), 230.506(b)(1) (2010). Applying these principles in the context of Internet Web sites, the SEC has concluded that the use of a Web site to offer or sell unregistered securities constitutes a "general solicitation" that disqualifies the offering as "private" unless the solicitation is contained in a password-restricted Web page that becomes available to a prospective investor who has been reasonably determined to be "accredited" or "sophisticated" within the meaning of regulation D. See Use of Electronic Media, SEC Release Nos. 33-7856, 34-42728, IC-24426, *supra* at 25,851-25,852; Lamp Techs., Inc., SEC No-Action Letter, 1997 SEC No-Act. LEXIS 638, at *5-6 (May 29, 1997) (placement of private offering materials on Web site inconsistent with prohibition against general advertising, unless procedures limit access to accredited investors).

III. *The Massachusetts act.* Massachusetts has adopted the Uniform Securities Act, which largely tracks the requirements of Federal securities law. See St. 1972, c. 694, § 1. See also G. L. c. 110A, § 415 (Massachusetts act "shall be so construed as to effectuate its general purpose . . . to coordinate the interpretation and administration of this [act] with the related federal regulation"). The Massachusetts act prohibits the offer or sale of securities in the Commonwealth unless the securities are registered, the security or transaction is exempt, or the security is a Federal covered security, that is, a security exempt from State regulation by imposition of Federal law. G. L. c. 110A, § 301. See 15 U.S.C. § 77r; G. L. c. 110A, § 306. As under the 1933 act, an "offer" is not limited to the common-law definition of the term, see *Bulldog I, supra* at 220, but is defined to include "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." G. L. c. 110A, § 401 (*i*) (2).

Massachusetts permits several exemptions from its registration

requirement; some we mention here. See G. L. c. 110A, § 402. First, as required by Federal law, see 15 U.S.C. § 77r(b)(4)(D), Massachusetts exempts any securities transaction that falls within the safe harbor of rule 506 of the SEC's regulation D, which requires compliance with the prohibition against general advertising in rule 502(c) of regulation D. See 950 Code Mass. Regs. § 14.402(B)(13)(l) (2000). A second exemption applies to certain transactions that follow an offer directed at no more than twenty-five people other than broker-dealers or banks and other financial institutions. G. L. c. 110A, § 402 (*b*) (9). Like regulation D, this exemption is not available if the issuer or anyone on the issuer's behalf "offers or sells the securities by any form of general advertising." 950 Code Mass. Regs. § 14.402(B)(9)(e) (2000). Massachusetts also exempts an offer of securities from registration in Massachusetts where the offer is communicated through the Internet, is not directed specifically to any investors in the Commonwealth, and no unregistered, nonexempt sales are made in the Commonwealth. 950 Code Mass. Regs. § 14.402(B)(13)(m) (2000).[8]

IV. *Discussion.* The plaintiffs argue that Massachusetts securities laws that prevent Bulldog from offering securities through general advertisements are overbroad and violate the First Amendment, applied to the States through the due process clause of the Fourteenth Amendment. They specifically challenge the constitutionality of the regulations that prohibit general solicitation and advertising by anyone offering unregistered securities. See 950 Code Mass. Regs. § 14.402(B)(9)(e), (B)(13)(l); 17 C.F.R. § 230.502(c). Because 950 Code Mass. Regs. § 14.402(B)(13)(l) incorporates the prohibition against general solicitation and advertising of unregistered securities in rule 502(c) of the SEC's regulation D, the plaintiffs' claims implicitly challenge the

---

[8]Under 950 Code Mass. Regs. § 14.402(B)(13)(m) (2000), if an online offer "contains indications that the offer is not being made in jurisdictions where it is not registered or appropriately exempted, then it will be presumed that this offer is not being specifically directed to prospective investors in the Commonwealth." Here, even if the disclaimer on Bulldog's Web site entitled it to a presumption that it had complied with the Massachusetts exemption for Internet offers, Bulldog's electronic mail (e-mail) solicitation to Hickey after he provided a Massachusetts address rebutted that presumption. See *Bulldog I, supra* at 218, 221.

constitutionality of this provision of Federal regulation. In short, the plaintiffs contend that the injunctive relief and administrative sanctions issued against them must be vacated because they are constitutionally entitled to maintain their Web site and communicate with any interested person, such as Bloness. We first consider whether the challenged provisions of Massachusetts securities law are constitutionally valid as applied to the communications at issue in this case and, if having determined that they are valid, proceed to the overbreadth challenge. *Trustees of the State Univ. of N.Y.* v. *Fox*, 492 U.S. 469, 484-485 (1989) (*Fox*).

1. *First Amendment protection.* The Secretary argues that we need not consider the First Amendment questions because an issuer's statements about its securities do not implicate the First Amendment. However, we find no basis for any exception to the First Amendment for speech that is restricted as part of the regulation of securities. We recognize that "the State does not lose its power to regulate commercial activity . . . whenever speech is a component of that activity," and note that the Supreme Court has stated in dicta that "the exchange of information about securities" is speech that is "regulated without offending the First Amendment" because it is a means of carrying out such commercial activity. *Ohralik* v. *Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978). But we do not equate the communications at issue here with commercial conduct of which speech is merely an incidental part. In *Bulldog I, supra*, we concluded that, viewed together, the e-mail to Hickey and the presentation, press articles, letter, and other materials that were attached to the e-mail constituted an offer of securities because they "were designed to stimulate interest in Bulldog's funds." The documents that comprised this offer are forms of expression akin to the advertising materials addressed in numerous First Amendment cases involving commercial speech. See, e.g., *Florida Bar* v. *Went For It, Inc.*, 515 U.S. 618, 620, 623 (1995) (direct-mail solicitations); *Bolger* v. *Youngs Drug Prods. Corp.*, 463 U.S. 60, 67 (1983) (informational pamphlets). Because such commercial advertising implicates the First Amendment, see *Virginia State Bd. of Pharmacy* v. *Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 763-765 (1976) (*Virginia Bd. of Pharmacy*), we conclude that Bulldog's communications concerning its

financial products, management, and investment philosophy are speech protected by the First Amendment.

2. *The nature of the speech at issue.* Having determined that the communications at issue are protected under the First Amendment, we next must determine "whether the principal type of expression at issue is commercial speech." *Fox, supra* at 473. This determination is of consequence because commercial speech has been said to occupy a "subordinate position in the scale of First Amendment values," where "modes of regulation [are allowed] that might be impermissible in the realm of noncommercial expression." *Ohralik* v. *Ohio State Bar Ass'n, supra.* Commercial speech is afforded less protection because it is " 'linked inextricably' with the commercial arrangement that it proposes," such that "the State's interest in regulating the underlying transaction may give it a concomitant interest in the expression itself." *Edenfield* v. *Fane,* 507 U.S. 761, 767 (1993), quoting *Friedman* v. *Rogers,* 440 U.S. 1, 10 n.9 (1979). See *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 499 (1996) (plurality opinion).[9]

But commercial speech is still afforded significant constitutional protection because of its importance to consumers and society as a whole. See *Virginia Bd. of Pharmacy, supra.* Commercial speech "assists consumers and furthers the societal interest in the fullest possible dissemination of information," *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N.Y.,* 447 U.S. 557, 561-562 (1980) *(Central Hudson),* and serves an important "public interest" in ensuring that decisions about the allocation of resources in a free enterprise economy are "intelligent and well informed." *Virginia Bd. of Pharmacy, supra* at 765. See *Central Hudson, supra* at 567 (protecting information available for consumers is "purpose of the First Amendment"); *Ohralik* v. *Ohio State Bar Ass'n, supra* at 454 (First Amendment safeguards "society's interest . . . in assuring the free flow of commercial information"). As such, the protection received by commercial speech is "qualified but

[9]The United States Supreme Court has also noted that distinguishing commercial from noncommercial speech protects the latter because "parity of constitutional protection . . . could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee" as to noncommercial speech. *Ohralik* v. *Ohio State Bar Ass'n,* 436 U.S. 447, 456 (1978).

nonetheless substantial." *Bolger* v. *Youngs Drug Prods. Corp.*, *supra* at 68.

Commercial speech is most commonly defined as that which "propose[s] a commercial transaction." *Fox, supra* at 473, quoting *Virginia Bd. of Pharmacy, supra* at 762. See, e.g., *Milavetz, Gallop & Milavetz, P.A.* v. *United States*, 130 S. Ct. 1324, 1339 (2010) (*Milavetz*) (advertising by debt relief agencies); *Thompson* v. *Western States Med. Ctr.*, 535 U.S. 357, 366 (2002) (*Thompson*) (advertising and solicitation of prescriptions for "compounded drugs"); *Greater New Orleans Broadcasting Ass'n* v. *United States*, 527 U.S. 173, 184 (1999) (broadcasting casino advertising); *Florida Bar* v. *Went For It, Inc., supra* (attorney direct-mail solicitations); *Rubin* v. *Coors Brewing Co.*, 514 U.S. 476, 481 (1995) (publication of alcohol content on beer labels); *Ibanez* v. *Florida Dep't of Business & Professional Regulation, Bd. of Accountancy*, 512 U.S. 136, 138, 142 (1994) (attorney's publication of professional certifications in "Yellow Pages" listings and on business cards and other materials). While it is difficult to delineate precisely the range of expression that falls into the commercial speech category, see *Cincinnati* v. *Discovery Network, Inc.*, 507 U.S. 410, 419 (1993), speech "advertising the price of a product or arguing its merits" is a "typical" example of commercial speech. *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 576 (1988).

Some commercial speech may be so "inextricably intertwined" with noncommercial speech as to lose its commercial character, where "the nature of the speech taken as a whole" is noncommercial. See *Riley* v. *National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 (1988). But the mere presence of noncommercial speech in commercial materials does not alter the commercial character of the surrounding communications. See *Fox, supra* at 473-474 ("Tupperware parties" were commercial speech even though they included discussion of financial responsibility and home economics, where "[n]o law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares"). Communications may thus be categorized as commercial speech "notwithstanding the fact that they contain discussions of important public issues." *Bolger* v. *Youngs Drug Prods. Corp.*,

*supra* at 67-68 (condom manufacturer's pamphlet discussing venereal disease and also promoting specific products was commercial speech). See *Zauderer* v. *Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 637 & n.7 (1985) (*Zauderer*) (attorney's advertisement offering representation and giving information about legal rights to women alleging injury caused by particular intrauterine device was commercial speech). Because "[a] company has the full panoply of protections available to its direct comments on public issues . . . there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions." *Bolger* v. *Youngs Drug Prods. Corp.*, *supra* at 68.

Here, having already concluded that the communications at issue were "designed to stimulate interest in Bulldog's funds" and "constituted a solicitation of an offer to buy unregistered securities," *Bulldog I, supra* at 220, we think it plain that "the principal type of expression at issue is commercial speech." *Fox, supra* at 473. Accordingly, we proceed to consider whether the challenged provisions of Massachusetts securities law are permissible regulations of commercial speech.

3. *The two standards of review for commercial speech.* The United States Supreme Court has articulated two distinct standards of review that are applicable in commercial speech cases. Where the government *prohibits* a category of commercial speech, the Supreme Court applies an intermediate scrutiny test articulated in *Central Hudson, supra* at 566, requiring that restrictions "be tailored in a reasonable manner to serve a substantial state interest." *Edenfield* v. *Fane*, 507 U.S. 761, 767 (1993) (striking down ban on in-person solicitation by certified public accountants). See *Sorrell* v. *IMS Health Inc.*, 131 S. Ct. 2653, 2667-2668 (2011) (State must show "statute directly advances a substantial governmental interest and that the measure is drawn to achieve that interest"). However, where the government requires the *disclosure* of commercial information, the Court applies a more generous test, upholding disclosure requirements that are "reasonably related to the State's interest in preventing deception of consumers." *Zauderer, supra* at 650, 651 (recogniz-

ing "material differences between disclosure requirements and outright prohibitions on speech").[10]

In *Virginia Bd. of Pharmacy, supra* at 770, the case in which commercial speech was first held to be protected by the First Amendment, the Court held unconstitutional a State statute that prohibited pharmacists from advertising the price of any prescription drug. The Court recognized that the State's justification for the advertising ban — the fear that price competition would diminish the professionalism of pharmacists and the quality of the services they provide — "rests in large measure on the advantages of [citizens] being kept in ignorance." *Id.* at 769. The Court noted that the "alternative to this highly paternalistic approach . . . is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Id.* at 770. Recognizing that the public interest is served where private economic decisions are "intelligent and well informed," the Court concluded that "[i]t is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us." *Id.* at 765, 770.

Since then, the Supreme Court has consistently articulated two key principles in the commercial speech cases: it views "as dubious any justification that is based on the benefits of public ignorance," and it has prescribed that the "preferred remedy" for the risk to the public of inaccurate or incomplete information "is more disclosure, rather than less." *Bates* v. *State Bar of*

---

[10]By contrast, the content of noncommercial speech is fully protected under the First Amendment to the United States Constitution and may be regulated by the government only where such regulation is the least restrictive means to further a compelling State interest. See, e.g., *Sable Communications of Cal., Inc.* v. *FCC*, 492 U.S. 115, 126 (1989). Strict scrutiny may also be applied to laws that compel particular noncommercial disclosures. See *Riley* v. *National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796-797 (1988). Unlike laws requiring particular *commercial* speech disclosures, such laws attempt to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *Zauderer* v. *Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626, 651 (1985) (*Zauderer*), quoting *West Virginia State Bd. of Educ.* v. *Barnette*, 319 U.S. 624, 642 (1943).

*Ariz.*, 433 U.S. 350, 375 (1977). See *Thompson, supra* at 374 ("We have previously rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information").

Applying these principles, where the government has suppressed commercial speech and where its suppression has diminished consumers' ability to make informed and reliable decisions regarding lawful purchases, the Supreme Court has applied the intermediate scrutiny of the *Central Hudson* test (or, before *Central Hudson*, a variant of the test) and, with few exceptions, struck down laws suppressing commercial speech. See, e.g., *Thompson, supra* (striking down provisions of Federal statute that prohibited pharmacists from advertising compounded drugs); *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525 (2001) (striking down restrictions on outdoor and in-store advertising of cigarettes, smokeless tobacco, and cigars); *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484 (1996) (striking down State statute prohibiting retail price advertising of alcoholic beverages); *Central Hudson, supra* (striking down ban on advertising by electric utilities that promoted use of electricity); *Linmark Assocs., Inc.* v. *Willingboro*, 431 U.S. 85 (1977) (striking down town ordinance prohibiting posting of "for sale" signs on homes in order to stem flight of white home owners from integrated community).[11] Consistent with the disfavor that these cases demonstrate for laws that suppress information in an attempt to

---

[11]Where the Court has applied the intermediate scrutiny test of *Central Hudson Gas & Elec. Corp.* v. *Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980) (*Central Hudson*), and upheld a restriction on speech, the challenged restriction generally addressed concerns relating to the means of delivering the regulated speech, rather than the content of the speech itself. In *Ohralik* v. *Ohio State Bar Ass'n*, 436 U.S. 447 (1978), the Supreme Court held that a State bar could discipline an attorney for visiting an accident victim in her hospital room and asking her to sign a representation agreement. The Court reasoned that in-person solicitation inherently exerted pressure on the potential client to provide an immediate response to the offer of legal representation and thereby encouraged "speedy and perhaps uninformed decisionmaking"; solicitation of this sort could well "disserve the individual and societal interest . . . in facilitating 'informed and reliable decisionmaking.' " *Id.* at 457, 458, quoting *Bates* v. *State Bar of Ariz.*, 433 U.S. 350, 364 (1977). See *Florida Bar* v. *Went For It, Inc.*, 515 U.S. 618 (1995) (upholding Florida bar rules prohibiting attorneys from sending targeted mail solicitations to victims

influence consumer choice, the Supreme Court recently struck down a State statute that burdened speech in order to "tilt public debate in a preferred direction" and discourage demand for a particular disfavored product (in this case, higher priced brand-name drugs). See *Sorrell* v. *IMS Health Inc.*, *supra* at 2670-2671.[12]

By contrast, where a government has required particular commercial disclosures, the Supreme Court has recognized that laws that compel disclosure are consistent with the core principles that underlie the commercial speech doctrine because they are designed to diminish public ignorance and make accurate and complete information available. See *Zauderer*, *supra* at 651. Where an advertiser is required to disclose "purely factual and uncontroversial information," the advertiser's rights "are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.* See *Milavetz*, *supra* at 1339-1340 (applying *Zauderer* reasonable relation test to requirement that agencies providing debt relief services disclose that debt relief may involve bankruptcy relief). In addition, "because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech," *Zauderer*, *supra* at 651, the Court has repeatedly stated in commercial speech cases that a disclosure requirement is a less burdensome and more appropriate alternative. See *Thompson*, *supra* at 376; *Central Hudson*, *supra* at 570-571; *Virginia Bd. of Pharmacy*, *supra* at

and relatives for thirty days following accident or disaster, concluding that such solicitation is intrusion on privacy that reflects poorly on legal profession). The Court has also upheld a restriction on broadcast advertising where the services advertised were illegal in the broadcaster's State. See *United States* v. *Edge Broadcasting Co.*, 509 U.S. 418 (1993) (upholding Federal statute barring broadcast of lottery advertising by broadcasters located in States that prohibit lotteries).

[12]In *Sorrell* v. *IMS Health Inc.*, 131 S. Ct. 2653, 2664 (2011), the Supreme Court declared that, where speech is restricted or burdened based on its content, "heightened judicial scrutiny is warranted." The Court explained, however, that heightened scrutiny is required "whenever the government creates 'a regulation of speech because of disagreement with the message it conveys.' " *Id.*, quoting *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989). Unlike the speech restriction at issue in *Sorrell* v. *IMS Health Inc.*, *supra*, the regulation of securities offers at issue in this case is intended to ensure the availability of full and fair information about securities and does not arise "because of disagreement with the message."

771 n.24. See also *Citizens United* v. *Federal Election Comm'n,* 130 S. Ct. 876, 914-915 (2010) (upholding disclosure requirements in context of "electioneering communications," noting "disclosure is a less restrictive alternative to more comprehensive regulations of speech").

4. *Application of* Zauderer *reasonable relation test.* Because securities regulation since 1933 has been designed to ensure the availability of adequate information about securities through the requirement of thorough disclosures, we analyze whether the challenged provisions satisfy the *Zauderer* reasonable relation test. In considering the applicability of this test, we note first that a disclosure requirement typically incorporates a prohibition on commercial speech (or conduct), because the commercial speaker is generally barred from advertising or engaging in particular conduct unless the speaker makes the disclosure. See, e.g., *Milavetz, supra* at 1330 (requirement that debt relief agencies make required disclosure in advertisements operates as ban on advertising unless disclosure is made); *Zauderer, supra* at 633 (requirement that attorneys advertising contingent fee arrangements make required disclosures operates as ban on advertising contingent fee representation without disclosures). Thus, the existence of a conditional prohibition on commercial speech, which the speaker may avoid by making the disclosure, does not itself subject the disclosure requirement to the *Central Hudson* test. See *Zauderer, supra* at 651. Rather, a typical disclosure requirement incorporates a ban on speech (or conduct) that defines and enforces the disclosure rule.

The fundamental principle woven into Massachusetts securities laws, as well as the 1933 act and its accompanying regulations, is complete and accurate disclosure in the sale of securities. This is not only clear from the purpose and history of the 1933 act, described in its preamble as an act to "provide full and fair disclosure," Pub. L. No. 73-22, 48 Stat. 74 (May 27, 1933), but is apparent from the plain language of the Federal and State provisions at issue in this case. By requiring the filing of a registration statement before a public offering can be made, the Massachusetts act ensures that potential buyers are provided with detailed information about the securities being offered and the entities offering them, including financial statements that

have been certified by an independent accountant in accordance with generally accepted accounting principles. See G. L. c. 110A, §§ 301-303; 950 Code Mass. Regs. §§ 14.401, 14.412(C) (2000). The prohibition against public offerings that Bulldog challenges as a violation of the First Amendment right to free speech is simply the means to enforce the disclosure requirements for a public offering, specifically the filing of a registration statement. While a registration statement is not required for a private offering of securities, a private offering, as the name suggests, is a limited exemption from the general registration requirement, permitting offers to accredited and sophisticated investors who, precisely because they are accredited and sophisticated, are deemed able to fend for themselves. See *Securities & Exch. Comm'n* v. *Ralston Purina Co.*, 346 U.S. 119, 122 & n.5, 124-125 (1953).

Neither the Federal nor the State government has prevented Bulldog from making information about its securities available to the general public, because nothing prevents Bulldog from filing a registration statement, with all its required disclosures, and advertising its securities to the general public. This is not a case in which the government seeks to "keep people in the dark for what the government perceives to be their own good." *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 503 (1996) (plurality opinion). See *Virginia Bd. of Pharmacy, supra* at 769. Rather, the prohibition on speech at issue in this case is incorporated into a disclosure regime that is designed to encourage, not suppress, full and fair disclosure.

Bulldog argues that the Supreme Court's application of the *Central Hudson* test in *Thompson, supra* at 367, demonstrates that this case should also be analyzed as a prohibition on speech where that test is applied. *Thompson, supra* at 360-361, 364-365, involved three provisions of Federal law: a requirement that all new drugs submit to Federal new drug approval procedures, an exemption to these approval procedures for "compounded drugs" (created when a pharmacist combines or alters ingredients, such as to generate a medication tailored to a particular patient's needs), and a ban on advertising of compounded drugs that had not been approved through the new drug approval procedures. Bulldog argues that its decision not

to file a registration statement is analogous to a compounder's decision not to seek Federal new drug approval, and that the ban on general solicitation should be reviewed under the *Central Hudson* test, as was the advertising ban in the *Thompson* case. However, none of the parties in *Thompson* challenged the appropriateness of applying the *Central Hudson* test, and the Court did not discuss how or under what circumstances a different test might be applicable. *Thompson, supra* at 367. This is probably because it was undisputed in *Thompson* that approval was too costly to be practicable for a small scale compounded drug designed for the needs of an individual patient, so that requiring Federal approval of all drug products compounded by pharmacies would effectively eliminate the practice of compounding. *Id.* at 369.

The ban on advertising at issue in *Thompson*, while theoretically conditional, was not designed to enforce a disclosure requirement imposed on drugs that obtain Federal approval. Rather, the ban was enacted to prevent compounders from successfully marketing new drugs on a large scale without undergoing the Federal new drug approval process, a purpose that the Court found could be served by directly regulating compounded drug production rather than regulating speech. *Id.* at 370-372. *Thompson, supra*, thus involved the type of speech ban that is typically analyzed under the *Central Hudson* test because it limits the information available to the public about lawful purchases and "threatens societal interests in broad access to complete and accurate commercial information that First Amendment coverage of commercial speech is designed to safeguard." *Edenfield v. Fane*, 507 U.S. 761, 766 (1993), and cases cited.

Bulldog further argues that, even if the prohibition on general solicitation is incidental to a disclosure scheme, the standard articulated in *Zauderer, supra* at 651, is not applicable because that case asks whether a disclosure requirement is "reasonably related to the State's interest in preventing deception of consumers," and no deception is alleged in this case; instead, the parties stipulated that the information on Bulldog's Web site and in its direct e-mail communication with Hickey was not misleading. We recognize that the disclosures required in *Milavetz* and *Zauderer* were intended to combat inherently misleading advertise-

ments, but we do not agree that the more deferential review for required commercial disclosures applies only to disclosures designed to prevent deception and not to disclosures designed to ensure that consumers have full and fair information. Both *Milavetz* and *Zauderer* treat disclosures differently from restrictions on speech because of the commercial speaker's "minimal" constitutionally protected interest in not providing "factual and uncontroversial information," and because disclosure rules serve the social interest in increasing the information available to the public, an interest that undergirds the protection of commercial speech in the first place. *Zauderer, supra.* See *Milavetz, supra* at 1339; *Central Hudson, supra* at 567; *Virginia Bd. of Pharmacy, supra* at 764-765.[13] Because *Milavetz* and *Zauderer* do not expressly limit the reasonable relation test to the particular State interest in preventing consumer deception, and the rationales on which they rely are equally applicable to the State interest asserted here of ensuring full and accurate information to securities investors, we conclude that the appropriate First Amendment test in this case is the reasonable relation test in *Zauderer, supra,* not the *Central Hudson* test.[14] Accord *New York State Restaurant Ass'n* v. *New York City Bd. of Health,* 556 F.3d 114, 132-133 (2d Cir. 2009) (requirement that chain restaurants post calorie information analyzed pursuant to *Zauderer* test although State not acting to prevent consumer deception); *Pharmaceutical Care Mgt. Ass'n* v. *Rowe,* 429 F.3d 294, 310 n.8 (1st Cir. 2005), cert. denied, 547 U.S. 1179 (2006) ("we have found no

---

[13]We further note that in a recent Supreme Court case Justice Thomas invited the Court to state expressly that disclosure requirements are constitutional only where aimed at advertising that is "*inherently likely* to deceive" or "has *in fact* been deceptive . . . (emphasis added)." *Milavetz, Gallop & Milavetz, P.A.* v. *United States,* 130 S. Ct. 1324, 1344 (2010) (Thomas, J., concurring in part and concurring in the judgment), quoting *Matter of R.M.J.,* 455 U.S. 191, 202 (1982). The Court declined to articulate such a limitation, and no other Justice joined Justice Thomas.

[14]We note that this conclusion accords with the Supreme Court's dicta indicating that the reasonable relation test articulated in *Zauderer, supra,* is appropriate where a securities regulation is challenged on First Amendment grounds. See *Riley* v. *National Fed'n of the Blind of N.C., Inc.,* 487 U.S. 781, 796 n.9 (1988), citing *Zauderer, supra* ("[A]nalogy to the securities field entirely misses the point. Purely commercial speech is more susceptible to compelled disclosure requirements").

cases limiting *Zauderer*" to State interest in preventing consumer deception). See *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 501 (1996) (plurality opinion) ("When a State regulates commercial messages to protect consumers from misleading, deceptive, or aggressive sales practices, *or* requires the disclosure of beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech and therefore justifies less than strict review" [emphasis added]).

Applying the *Zauderer* reasonable relation test, we conclude that the disclosure requirement at issue here, a registration statement that must be in effect prior to a public offering of securities, is reasonably related to the State's interest in promoting the integrity of capital markets by ensuring that investors make decisions based on full and accurate information. Where the issuer has chosen not to file a registration statement and make the required disclosures, the incidental ban on general solicitation of unregistered securities is reasonably related to the same State interest.

5. *Application of* Central Hudson *test.* Even if we were to view the challenged regulations at issue as prohibitions on commercial speech, rather than as part of a broader disclosure requirement, we conclude that they withstand constitutional scrutiny under the *Central Hudson* test. In *Central Hudson, supra* at 566, the Court established a four-pronged test to determine the constitutionality of restrictions on commercial speech:

> "At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest."

See *Lorillard Tobacco Co.* v. *Reilly,* 533 U.S. 525, 554 (2001); *Rubin* v. *Coors Brewing Co.,* 514 U.S. 476, 482 (1995). The government bears the burden of proving the constitutionality of

its regulation under this test. See *Bolger* v. *Youngs Drug Prods. Corp.*, 463 U.S. 60, 71 n.20 (1983).[15]

Here, the first and second prongs are not at issue, because the parties have stipulated that the speech in this case concerns lawful activity and is not misleading, and that the Commonwealth has a substantial State interest in protecting the integrity of capital markets, and thereby preserving the over-all health of the economy, by ensuring that investors make decisions based on full and accurate information. Thus, we need only determine whether the third and fourth prongs of *Central Hudson* are satisfied, that is, whether the challenged regulations "directly advance" the substantial government interest and are "not more extensive than is necessary to serve that interest." *Id.* at 564, 566.

Under the third prong of *Central Hudson*, we must determine "whether the speech restriction directly and materially advances the asserted governmental interest." *Greater New Orleans Broadcasting Ass'n* v. *United States*, 527 U.S. 173, 188 (1999). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield* v. *Fane*, 507 U.S. 761, 770-771 (1993). See *Greater New Orleans Broadcasting Ass'n* v. *United States*, *supra*. Accordingly, a restriction on commercial speech

---

[15]Although the Supreme Court has continued to apply the *Central Hudson* test, see *Sorrell* v. *IMS Health Inc.*, 131 S. Ct. 2653, 2667-2668 (2011); *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 554-555 (2001), we recognize that a number of Supreme Court Justices have over the years expressed criticism of the test. See *id.* at 571-572 (Kennedy, J., concurring in part and concurring in the judgment) (expressing "continuing concerns that the [*Central Hudson*] test gives insufficient protection to truthful, nonmisleading commercial speech"); *id.* at 572 (Thomas, J., concurring in part and concurring in the judgment) ("I continue to believe that when the government seeks to restrict truthful speech in order to suppress the ideas it conveys, strict scrutiny is appropriate, whether or not the speech in question may be characterized as 'commercial' "); *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 517 (1996) (Scalia, J., concurring in part and concurring in the judgment) (*Central Hudson* test "seems to me to have nothing more than policy intuition to support it"). The application of *Central Hudson* has generated the strongest doubts from members of the Court where advertising has been restricted to quell demand for a lawful advertised product (such as tobacco, alcohol, or gaming), not to preserve "the fair bargaining process." *Id.* at 501 (plurality opinion). The securities regulations at issue here, however, do not raise this concern.

will not be upheld "if it provides only ineffective or remote support for the government's purpose." *Central Hudson, supra* at 564.

Bulldog asks us to construe this direct advancement prong of *Central Hudson* as a requirement that the connection between the regulation of speech and the State's interest not depend on intermediate steps. This reading, however, is unsupported by the Supreme Court's commercial speech jurisprudence, which has emphasized the reliability and effectiveness with which a regulatory mechanism advances the State's goal, rather than the presence or absence of intermediate steps. In *Central Hudson, supra* at 569, the Court found that a regulation that prohibited an electric utility from promoting the use of electricity in advertisements had a "direct link" to the State interest in energy conservation and satisfied the third prong of the test, although it is clear that the effect of the regulation on the State interest depended on the choices of consumers. See *Florida Bar* v. *Went For It, Inc.*, 515 U.S. 618, 625, 628 (1995); *United States* v. *Edge Broadcasting Co.*, 509 U.S. 418, 428 (1993). Similarly, where the Supreme Court has found the third prong of the *Central Hudson* test not to be satisfied, it has not highlighted the presence of intermediate causal steps, but rather has emphasized the ineffectiveness of the regulation at serving the State's objective. See, e.g., *Sorrell* v. *IMS Health Inc.*, 131 S. Ct. 2653, 2669-2671 (2011) (law limiting use of prescriber information in connection with marketing efforts, but allowing "extensive use of prescriber-identifying information" in other contexts, did not advance interest of protecting prescriber privacy, lowering costs of medical care, or promoting public health); *Greater New Orleans Broadcasting Ass'n* v. *United States, supra* at 193, quoting *Rubin* v. *Coors Brewing Co., supra* at 489 (finding " 'little chance' that the speech restriction could have directly and materially advanced its aim, 'while other provisions of the same Act directly undermine[d] and counteract[ed] its effects' ").

In this case, the Secretary offered in evidence the report and testimony of Franco, an expert witness who teaches and writes about securities regulation and who served as assistant general counsel in the SEC's office of general counsel.[16] Finding

---

[16] Also in evidence was a report of the International Organization of Securi-

Franco's opinions to be "well-founded and highly credible," the trial judge adopted them in substance. On the issue of effectiveness, the judge found:

> "The public filing of a registration statement, conforming in both form and content to uniform regulatory requirements, serves to provide complete, balanced, and accurate information not only to those who might consider investing in a particular offering, but also to the public as a whole, including regulatory officials, private analysts, large investors, and the news media, whose review serves as a powerful check on the accuracy and completeness of the information provided. That process tends to result in market prices that accurately reflect value, for the benefit of all investors, both those purchasing the particular issue and those trading in other securities. The ban on general advertising of unregistered securities . . . provides a powerful incentive for issuers to register, despite the substantial costs of doing so, thereby maximizing the benefits of the registration system to the public as a whole; . . . it is vital to the effectiveness of the registration system."

We adopt these findings and agree that the public filing of a registration statement provides the best assurance that investors in publicly offered securities will make decisions based on full and accurate information. We also consider compelling the expert's conclusion that the registration system's ability to promote well-informed markets would be compromised if unregistered securities could be widely advertised using incomplete information selected by the issuer. Therefore, we conclude that the prohibition against publicly advertising an offer to sell unregistered securities about which the required disclosures have not been made available effectively, directly, and materially advances the State's interest in preserving the integrity of capital markets by ensuring that investors make decisions based on full

ties Commissions, entitled Objectives and Principles of Securities Regulation (1998), which identified "[f]ull disclosure" as "the most important means for ensuring investor protection" and identified the timely and widespread dissemination of relevant information as fundamental to an efficient market. *Id.* at 6-7.

and accurate information. See *Greater New Orleans Broadcasting Ass'n* v. *United States, supra* at 188.[17]

The fourth prong of *Central Hudson, supra* at 566, asks whether a challenged regulation is "more extensive than is necessary" to serve the asserted government interest. In *Fox, supra* at 480, the Supreme Court clarified that this prong does not require the regulatory scheme to be the least restrictive means of achieving the government's objective; rather, it analyzes the "fit" between governmental objectives and the regulatory means chosen, and requires that fit to be "not necessarily perfect, but reasonable." See *Sorrell* v. *IMS Health Inc., supra* at 2668, quoting *Fox, supra* at 480 (regulation must be "drawn to achieve" the State interest and requires "fit between the legislature's ends and the means chosen to accomplish those ends"); *Lorillard Tobacco Co.* v. *Reilly,* 533 U.S. 525, 561 (2001) (fourth prong "requires a reasonable fit between the means and ends of the regulatory scheme"). The fourth prong of *Central Hudson* is, therefore, an inquiry into whether the scope of the restriction on speech is in proportion to the interest served by the restriction. See *Sorrell* v. *IMS Health Inc., supra; Greater New Orleans Broadcasting Ass'n* v. *United States, supra; Fox, supra.* Although the costs to free speech must be "carefully calculated," governments have "leeway" to "judge what manner of regulation may best be employed." *Id.* at 480, 481.[18]

In this case, Bulldog has offered eleven alternative measures

---

[17]We note that the Secretary's expert did not base his conclusions on empirical evidence, but rather on experience and economic theory. However, the Supreme Court has not required a regulator to put forth empirical evidence of a regulation's effectiveness at addressing a State interest, and has itself relied on common sense and economic reasoning in finding effectiveness. See *United States* v. *Edge Broadcasting Co.,* 509 U.S. 418, 428-429 (1993). See also *Lorillard Tobacco Co.* v. *Reilly, supra* at 555; *Florida Bar* v. *Went For It, Inc.,* 515 U.S. 618, 628 (1995). Only where common sense or evidence in the record suggests a regulation would be ineffective has the Court required more concrete evidence of a regulation's effectiveness. See *Edenfield* v. *Fane,* 507 U.S. 761, 771-773 (1993) (State regulatory board failed to prove effectiveness of regulation barring in-person solicitation by accountants where evidence in record undercut asserted dangers and board did not supply any evidence, anecdotal or otherwise, about need for ban).

[18]Although the Court stated in *Thompson* v. *Western States Med. Ctr.,* 535 U.S. 357, 371 (2002) (*Thompson*), that its previous cases "made clear that if the Government could achieve its interests in a manner that does not restrict

that they suggest would serve the asserted State interest with less restriction on speech, and the parties have stipulated that these are the only alternative means that are at issue in this litigation. These alternatives propose to shift regulation from the offer stage to the point of sale by preserving the restrictions on the sale of unregistered securities while permitting solicitation of offers from the general public. Instead of regulating offers, the alternatives would provide additional regulation at the point of sale, such as extra reporting requirements, additional controls on the accreditation of investors, a waiting period before transactions became final, or authorization to the Secretary to rescind transactions that fail to comply with applicable law.[19]

The judge, relying on Franco's expert opinion, found that these alternatives "would decrease the protection of investors and impair market integrity." The judge declared:

"[A]ll of the plaintiffs' proposals would reduce the incentive to register, and encourage issuers to make unregistered offerings, sacrificing lawful access to some potential buyers in favor of saving the costs of registration. . . . [A]ll of the proposals would likely result in increased 'distortive' (that is, unbalanced) communications, increased incidence of unlawful transactions (such as sales to unaccredited investors), and proliferation of scams. Those proposals that rely on increased enforcement activity in connection with sales would suffer from the problem of coming after, rather than before transactions, when dissipation of assets may prevent effective remedies."

speech, or that restricts less speech, the Government must do so," the Court's recent decision in Sorrell v. IMS Health Inc., supra at 2667-2668, confirms that Thompson did not overturn Trustees of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 477 (1989) (Fox), or create a least restrictive means test. See also Greater New Orleans Broadcasting Ass'n v. United States, 527 U.S. 173, 188 (1999) ("Government is not required to employ the least restrictive means conceivable"); Florida Bar v. Went For It, Inc., supra at 632 ("we made clear that the 'least restrictive means' test has no role in the commercial speech context").

[19]Another alternative proposed by Bulldog was to prohibit all sales of unregistered securities to Massachusetts residents. This alternative, however, would violate preemption provisions in the 1933 act, 15 U.S.C. §§ 77a et seq., which require States to exempt securities that fall under the safe harbor of rule 506 of regulation D from any State registration requirement. See 15 U.S.C. § 77r(b)(4)(D).

We agree. The proposed alternatives will certainly decrease the quality of, and will likely decrease the quantity of, information in the marketplace; will increase the likelihood of securities scams and of unlawful sales of unregistered securities to unsophisticated investors; and will weaken the market's efficiency overall. Bulldog's proposal to concentrate enforcement at the point of sale rather than at the offer stage increases the risk that enforcement will come too late to prevent the harm or permit monetary recovery. We note that State securities regulation before 1933 largely focused on the regulation of transactions at the point of sale, and that the failure of this patchwork of State laws to achieve their regulatory aims demonstrated the need for the Federal 1933 act. Keller, Introductory Comment: A Historical Introduction to the Securities Act of 1933 and the Securities Exchange Act of 1934: Symposium on Current Issues in Securities Regulation, 49 Ohio St. L.J. 329, 331, 336 (1988). The framers of the 1933 act contemplated the drawbacks of after-the-fact enforcement and determined that these measures "lock[] the door after the horse is gone" and prevent regulators from effectively protecting investors from economic harm. Hon. Huston Thompson, Federal Securities Act Hearings before the House Interstate and Foreign Commerce Committee, 73d Cong., 1st Sess., on H.R. 4314, at 102 (1933), quoting statement of Hon. Clarence F. Lee, of California, Hearings before Committee on Interstate and Foreign Commerce on H.R. 7215, 67th Cong., 1st Sess.

In concluding that the challenged restriction on the public advertising of unregistered securities represents a reasonable fit between the regulatory ends and the means chosen, we recognize that this restriction is not a "blanket ban" on speech, *Central Hudson, supra* at 566 n.9, that can be considered in isolation, but an integral part of a broader regulatory scheme that mandates public disclosures and permits limited exemptions for private offerings directed at those investors who can be relied on adequately to inform themselves. See *Thompson, supra* at 376 (recognizing disclosure as "far less restrictive alternative" to a restriction on commercial speech). We also recognize that, if we were to declare the restriction unconstitutional in the name of freedom of speech, the foreseeable consequence would be less

speech, not more. See *Citizens United* v. *Federal Election Comm'n,* 130 S. Ct. 876, 911 (2010) ("it is our law and our tradition that more speech, not less, is the governing rule"); *Rubin* v. *Coors Brewing Co.,* 514 U.S. 476, 497 (1995) (Stevens, J., concurring in the judgment) ("more speech and a better informed citizenry are among the central goals of the Free Speech Clause"). In addition, we consider that the burden on First Amendment rights is diminished in this case because alternative channels of communication are available to Bulldog through the registration system and through the exemptions that permit communication with a limited group of investors. See *Florida Bar* v. *Went For It, Inc.,* 515 U.S. 618, 634 (1995) ("Finding no basis to question the commonsense conclusion that the many alternative channels for communicating necessary information about attorneys are sufficient, we see no defect in Florida's regulation"). By providing exemptions for private offerings, designed to lessen the burdens of securities laws when the protections of the regulatory system are not needed, see *Securities & Exch. Comm'n* v. *Ralston Purina Co.,* 346 U.S. 119, 122 & n.5, 124-125 (1953), the Secretary has "carefully calculated" the benefits and burdens of securities regulation, *Cincinnati* v. *Discovery Network, Inc.,* 507 U.S. 410, 417 (1993), rather than proceed by "wholesale suppression of truthful, nonmisleading information." *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 505 (1996) (plurality opinion). See *Lorillard Tobacco Co.* v. *Reilly,* 533 U.S. 525, 562 (2001).

Finally, we recognize that a measure of judicial restraint is appropriate where a court is asked to intrude on a system of securities regulation that has served the nation and this Commonwealth well since 1933, and to cut a stitch in the patchwork of regulatory enforcement that risks its unraveling and predictably will diminish its effectiveness. If any reminder was needed, the financial collapse in the autumn of 2008 that led to our persistent recession illustrates the extent to which unregulated and poorly regulated securities have the potential to become "financial weapons of mass destruction." The Great Derivatives Smackdown, Forbes, May 9, 2003, quoting Warren Buffett's Annual Letter to Shareholders of Berkshire Hathaway (March 8, 2003).

In light of these considerations and the judge's findings, supported by credible expert testimony, that none of the proposed alternatives would adequately achieve the State interest, we are persuaded that the Secretary has found a fit between its regulatory means and its goal of promoting full and accurate information in the sale of securities "that is not necessarily perfect, but reasonable." *United States* v. *Edge Broadcasting Co.*, 509 U.S. 418, 429 (1993). We, therefore, conclude that the Secretary has met his burden of satisfying the *Central Hudson* test.

6. *The overbreadth doctrine.* Having found that the speech at issue in this case is commercial, and that the challenged provisions of Massachusetts securities law constitutionally regulate that speech, we now consider Bulldog's claim that the regulations should nonetheless be found unconstitutional because they also restrict fully protected, noncommercial speech in violation of the First Amendment. The overbreadth doctrine allows an individual whose speech may be constitutionally regulated to argue that a law is unconstitutional because it infringes on the speech of others. See *Fox, supra* at 482-483. See also *United States* v. *Stevens*, 130 S. Ct. 1577, 1591-1592 (2010). Overbreadth has thus been described as an exception to the general principle that litigants only have standing to assert their own rights and not the rights of others; in the free speech context, such challenges have been permitted in order "to prevent [a] statute from chilling the First Amendment rights of other parties not before the court." *Secretary of State of Md.* v. *Joseph H. Munson Co.*, 467 U.S. 947, 957, 958 (1984). See *Eisenstadt* v. *Baird*, 405 U.S. 438, 445 n.5 (1972).[20] Despite the doctrine's origin as an exception to standing requirements, overbreadth challenges can also be brought, as here, where a law's application to the "principal type of expression at issue" in the case is constitutional, but the plaintiffs argue that their own First Amendment rights will be violated by *other* applications of the same law. *Fox, supra* at 473, 484.

The Supreme Court has recognized the overbreadth doctrine

---

[20]The overbreadth doctrine, which allows a litigant to address a statute's application to parties and scenarios outside the case, should not be confused with the requirement of *Central Hudson*'s fourth prong that restrictions on commercial speech be narrowly drawn. See *Central Hudson, supra* at 565 n.8 (noting distinction). See also *Fox, supra* at 482 (same).

as "strong medicine" and has limited its application to instances where a law "prohibits a substantial amount of protected speech." *United States* v. *Williams,* 553 U.S. 285, 292, 293 (2008), quoting *Los Angeles Police Dep't* v. *United Reporting Publ. Corp.,* 528 U.S. 32, 39 (1999). Substantial overbreadth demands a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *City Council of Los Angeles* v. *Taxpayers for Vincent,* 466 U.S. 789, 800-802 (1984) (declining to entertain overbreadth claim where such danger not shown). Further, the overbreadth must be *"substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *United States* v. *Williams, supra* at 292.

The overbreadth doctrine is not applied in commercial speech cases because the concern that speech will be chilled is much weaker in the case of a commercial speaker. See *Bates* v. *State Bar of Ariz.,* 433 U.S. 350, 380-381 (1977) ("Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation"). See also *Waters* v. *Churchill,* 511 U.S. 661, 670 (1994) (plurality opinion); *Fox, supra* at 481. However, this limitation is only relevant in cases where the speech restricted by the overbroad application is itself commercial speech; an overbreadth challenge may be raised by a commercial speaker claiming, as here, that a regulation unconstitutionally restricts noncommercial speech. *Id.*

We turn, therefore, to the question whether the relevant provisions of Massachusetts securities law reach a "substantial amount" of noncommercial speech. *United States* v. *Williams, supra.* Bulldog alleges, for example, that they are prevented from communicating about their unregistered securities "with anyone, including journalists, students, academics and others," even though these individuals are not interested in buying or selling securities. However, under the challenged provisions of Massachusetts securities law, an issuer's speech is restricted only where it is designed to solicit an offer to purchase securities. See G. L. c. 110A, §§ 301, 401 (*i*) (2). See also *Matter of Carl M. Loeb, Rhoades & Co.,* 38 SEC 843, 853 (1959) (allowing for "flow of normal corporate news, unrelated to a selling effort

for an issue of securities"); Interpretive Release on Regulation D, SEC Release No. 33-6455, 48 Fed. Reg. 10,045, 10,052 (1983) (if communication not "being used by the issuer or by someone on the issuer's behalf to offer or sell the securities . . . then the issuer will not be in violation of Rule 502[c]"); G.F. Gerstenfeld, SEC No-Action Letter, 1985 SEC No-Act. LEXIS 2790, *2 (Dec. 3, 1985) ("relevant question . . . is whether publication of the advertisement constitutes an offer to sell securities"); Bateman Eichler, Hill Richards, Inc., SEC No-Action Letter, 1985 SEC No-Act. LEXIS 2918, *1 (Dec. 3, 1985) (limited mailing of solicitation "generic in nature" and not making reference to any specific investment not an offer); G. L. c. 110A, § 415 (interpretation of Massachusetts act should be coordinated with related Federal law).

Bulldog can raise an overbreadth challenge, therefore, only if a substantial amount of speech included within the term "offer" is outside that which is categorized as commercial speech.[21] While "the precise bounds of the category of expression that may be termed commercial speech" are uncertain, *Zauderer, supra* at 637, the definition of an offer in securities law as a communication "designed to procure orders for a security," *Matter of Carl M. Loeb, Rhoades & Co., supra* at 848, Securities Act Release No. 2623 (July 25, 1941), is close to the common definition of commercial speech as that which "propose[s] a commercial transaction." *Fox, supra* at 473-474, quoting *Virginia Bd. of Pharmacy, supra* at 762. Although the outer limits of the two terms may not be identical, we conclude that the category of "offers" regulated by the Secretary and the SEC does not include a substantial amount of noncommercial speech relative to the plainly legitimate sweep of the statute and regulations. See *United States* v. *Williams, supra.* As a result, Bulldog's overbreadth challenge fails.

7. *Bloness's right to listen.* Bloness alleges that his First Amendment rights are independently violated by the Secretary's

[21]Although the Secretary concedes that he would have no authority to enforce a prohibition against noncommercial speech under the Massachusetts act, this concession is of little comfort if the act in fact allows the suppression of such speech. See *United States* v. *Stevens*, 130 S. Ct. 1577, 1591 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly").

enforcement of securities laws and regulations that prevent him from receiving information that Bulldog would otherwise make available, unless he first identifies himself and demonstrates he is an accredited or sophisticated investor.[22] We agree with Bloness that the interests of consumers in receiving commercial information, and the interests of society in the free flow of such information, have been the foundation of commercial speech doctrine from its inception. See *Central Hudson, supra* at 567 ("suppression of advertising reduces the information available for consumer decisions and thereby defeats the purpose of the First Amendment"); *Virginia Bd. of Pharmacy, supra* at 763 ("As to the particular consumer's interest in the free flow of commercial information, that interest may be as keen, if not keener by far, than his interest in the day's most urgent political debate"). See also *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 571 (2001) ("The First Amendment . . . constrains state efforts to limit advertising of tobacco products, because so long as the sale and use of tobacco is lawful for adults, the tobacco industry has a protected interest in communicating information about its products and adult customers have an interest in receiving that information").

We also agree that the Supreme Court has in certain cases recognized the rights of listeners regardless of whether the rights of the speakers were protected. See *Kleindienst v. Mandel*, 408 U.S. 753, 764 (1972) (First Amendment rights of listeners implicated where Federal government denied visa to foreign lecturer because of his advocacy of communism); *Lamont v. Postmaster Gen.*, 381 U.S. 301, 305 (1965) (First Amendment rights of recipient violated by postal service requirement that "communist political propaganda" originating in foreign country be delivered only if addressee filled out reply card indicating desire to receive such mail). See also *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas"). And we agree that, in certain circumstances, a listener's First Amendment rights may be infringed if he is required affirmatively to declare a desire to receive controversial communications,

---

[22]The parties have stipulated that Bloness is an accredited investor within the meaning of 17 C.F.R. § 230.501(a). See note 7, *supra*.

where the requirement may deter him from requesting these communications because of the risk to reputation, employment, or prospects for future employment. See *Lamont* v. *Postmaster Gen.*, *supra* at 307. See also *Denver Area Educ. Telecomm. Consortium, Inc.* v. *FCC*, 518 U.S. 727, 753-755 (1996) (striking down Federal requirement that "patently offensive" cable television programming be blocked and made available on separate channel only to subscribers who requested in writing to view the offensive content). But nothing in the cases Bloness cites requires independent consideration of his claim in this case, where we have already concluded that the government has permissibly regulated the communications of a commercial speaker. The consequence of recognizing the First Amendment rights of listeners is to give standing to listeners to assert that free speech has been unconstitutionally infringed, not to grant listeners a different standard of review or a greater right to listen to commercial speech than a speaker has to say it. See *Fox*, *supra* at 472-473, 475, 485-486 (*Central Hudson* was applicable standard where State university students claimed that violation of their First Amendment rights resulted from university's restriction of outside commercial speakers); *Virginia Bd. of Pharmacy*, *supra* at 757 ("If there is a right to advertise, there is a reciprocal right to receive the advertising, and it may be asserted by [consumers]"); *Spargo* v. *New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 83 (2d Cir. 2003), cert. denied, 541 U.S. 1085 (2004) (listeners "may claim no greater First Amendment protection" than speaker); *National Ass'n for the Advancement of Colored People* v. *Jones*, 131 F.3d 1317, 1322 (9th Cir. 1997), cert. denied, 525 U.S. 813 (1998) ("no precedent exists for the proposition that the listener's rights are greater than those of the speaker"). Where, as here, a State permissibly regulates commercial speech in a manner consistent with the First Amendment, its regulation will be upheld, regardless of whether the challenge is brought by a speaker or by a would-be listener. See *Fox*, *supra*. See also *American Future Sys., Inc.* v. *Pennsylvania State Univ.*, 752 F.2d 854, 862 (3d Cir. 1984), cert. denied sub nom. *Johnson* v. *Pennsylvania State Univ.*, 473 U.S. 911 (1985) ("the essential nature of the speech remains unchanged regardless of whose rights are being adjudicated,

and the same test should be used whether it is the speaker's or the listeners' rights that are at stake"). Having found that Bulldog's First Amendment rights were not violated by the Secretary's enforcement of Massachusetts securities laws, we need undergo no further analysis to conclude that the rights of Bloness to receive information were not violated.

V. *Conclusion.* The Supreme Court has on numerous occasions suggested that Federal and State securities laws do not run afoul of the First Amendment.[23] Although these statements have been dicta, they have also been consistent with the Court's recognition of a State's lawful ability to ensure that "the stream of commercial information flow[s] cleanly as well as freely." *Virginia Bd. of Pharmacy, supra* at 772. By encouraging the submission of comprehensive registration statements and allowing those who choose not to file them to advertise their securities to accredited and sophisticated investors but not to the public as a whole, the Secretary does not "threaten[] societal interests in broad access to complete and accurate commercial information that First Amendment coverage of commercial speech is designed to safeguard." *Edenfield* v. *Fane*, 507 U.S. 761, 766 (1993). Massachusetts securities regulation is not motivated by the supposed advantages of consumers "being kept in ignorance," *Virginia Bd. of Pharmacy, supra* at 769, or designed to "entirely suppress commercial speech in order to pursue a nonspeech-related policy." *Central Hudson, supra* at 566 n.9. Nor has Massachusetts "burdened a form of protected expression that it found too persuasive," while leaving "unburdened" speech that is "in accord with its own views." *Sorrell* v. *IMS Health Inc.*, 131 S. Ct. 2653, 2672 (2011). Rather, the Massachusetts act and accompanying regulations aid the

---

[23]See *Riley* v. *National Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 796 n.9 (1988) (striking down disclosure requirement in noncommercial speech context but assuring that result had no bearing on securities law); *Ohralik* v. *Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) ("Numerous examples could be cited of communications that are regulated without offending the First Amendment, such as the exchange of information about securities . . ."); *Paris Adult Theatre I* v. *Slaton*, 413 U.S. 49, 64 (1973) ("neither the First Amendment nor 'free will' precludes States from having 'blue sky' laws to regulate what sellers of securities may write or publish about their wares"). See also *Dun & Bradstreet, Inc.* v. *Greenmoss Bldrs., Inc.*, 472 U.S. 749, 758-759 n.5 (1985).

"preservation of a fair bargaining process," *44 Liquormart, Inc.* v. *Rhode Island,* 517 U.S. 484, 501 (1996) (plurality opinion), by ensuring the broad availability of accurate and balanced commercial information.

For the reasons discussed above, we hold that the challenged provisions of Massachusetts law are part of a constitutionally permissible disclosure scheme and, to the extent that they restrict speech, are tailored in a reasonable manner to serve a substantial State interest in promoting the integrity of capital markets by ensuring a fully informed investing public.

*Judgment affirmed.*