Billings, Thomas P., J.
This action arises out of the sale of what are alleged to have been securities by defendants Ross/Fialkow Capital Partners, LLP (“Ross/Fialkow”), Jay Lawrence Fialkow (“Fialkow”), and Jeffrey P. Ross (“Ross”) (collectively, the “defendants”) in connection with a multi-million dollar Ponzi scheme orchestrated by one Richard Elkinson (“Elkin-son”). The plaintiffs contend that the defendants violated, and aided the violation of, certain sections of the Massachusetts Uniform Securities Act, G.L.c. 110A (“MUSA”) and made negligent misrepresentations and omissions in connection with the sale in violation of state common law. Now before the Court is the defendants’ motion for summary judgment.
For the following reasons, the motion is DENIED.
BACKGROUND
The summary judgment record reveals the following facts, taken here in the light most favorable to the plaintiffs as the non-moving parties. Plaintiff Sidney L. Sherter (“Sherter”) is the trustee of the Beatrice Sherter 1989 Family Trust FBO Sidney L. Sherter, SLS Realty Trust, and Ilsen Nominee Trust. He is also the general partner of EMS Realty Partnership, and has durable power of attorney for plaintiff Gertrude Ilsen. Steven Holden (“Holden”) and plaintiff Joseph Less (“Less”) are Shelter's sons-in-law. Amy Sherter Less is Shelter's daughter, and is married to Less. Jonathan Sherter is Shelter’s son, and the Jonathan Sherter IRA (“Sherter IRA”) is a Massachusetts Trust.
Ross/Fialkow is a limited liability partnership organized under the laws of the Commonwealth. The company’s 1999 registration filed with the Secretary of the Commonwealth describes the partnership’s business as, inter alia, “to engage in the practice of investment banking/brokerage.” Ross and Fialkow are the only two limited partners of Ross/Fialkow. Ross/Fialkow, Ross, and Fialkow were not registered as broker-dealers, agents, or in any other capacity in the securities business.
Elkinson, who sometimes conducted business under the name Northeast Sales Co., began in 1997 to solicit investors, representing that he was in the business of brokering contracts for the manufacture in Japan of uniforms (such as police and prison uniforms) for large purchasers, such as state and local governments, as well as for the U.S. Olympic Committee. Elkinson told investors that he entered into contracts directly with purchasers, then paid 50% of the total contract price as a down payment or deposit to the manufacturer. Upon delivery of the uniforms, Elkinson would receive full payment from the purchaser, forward the balance due to the manufacturer, and retain the rest.
Elkinson represented that, because banks were unwilling to lend funds based on unexecuted contracts, he needed private financing to pay the 50% down payment. He provided investors with securities in the form of promissory notes, executed in his personal capacity. By their terms, the notes generally required repayment within a term of 330 to 360 days, and paid interest that ranged from 9% to 13% for the stated term.
To invest, the investor wrote a check directly to Elkinson. Upon maturity of the notes, s/he was given the option to take a return of their principal and interest, or to take interest only and roll over the principal, or to roll over both principal and interest into a new note. At no time was any promissoiy note issued by Elkinson registered as a security under §301 of MUSA; nor were the notes exempt under §402, nor did they constitute federal covered securities.
Between 1997 and 2005, Richard Silverman (“Silver-man”) acted as Elkinson’s promoter. Silverman introduced Elkinson to Ross, and upon Silverman’s recommendation, Ross in August 1997 invested with Elkinson. In 2000 or 2001, Silverman asked Ross if Ross would like to make an additional investment. Ross, who did have enough cash at the time, asked Fialkow if he’d like to split the note, which he did. Subsequently, Fialkow invested with Elkinson on his own.[2]
Sometime in 2003 or 2004, Elkinson and Silverman approached the defendants and asked them to take over Silverman’s role as finders of additional investors. As part of the transition, Silverman emailed Ross on March 16, 2005, outlining the status of the current investors and stating, “Don’t know if I’ve told you how long this has been going but I’ve been in for 15 years. This is to sooth [sic] those new investors who think it’s a Ponzi scheme when they see the high rate of interest.” Exh. 53.
Ross and Fialkow told Elkinson that they would be able to raise between one and two million dollars in a period of two years.[3] They entered into a business relationship with Elkinson in 2005, whereby they agreed to find investors for Elkinson, who in return agreed to pay Ross/Fialkow 2% of any investment received from someone that they located. In addition, Elkinson also agreed to pay defendants an additional 1.5% of any principal amounts rolled over in the future by investors whom Silverman had located.
*100 Elkinson paid the commissions[4] to Ross/Fialkow. Ross and Fialkow split them equally although Ross, through whom the relationship with Elkinson had originated, was responsible for keeping track of the commissions paid, depositing the checks and keeping track of the deposit slips. Ross was also the person responsible for day-to-day dealings with Elkinson and for Ross/Fialkow’s mailing and email list.
On October 1, 2006, Ross and Fialkow sent a letter to Elkinson in which they stated that pursuant to recent discussions, upon Elkinson’s “demise” or mental incapacity, they would continue as advisors to Northeast Sales. To satisfy Elkinson’s “investors” and to assist in the liquidation of Northeast Sales, they would become signatories to Elkinson’s checking account as “liquidating trustees.” The letter went on to state, “Even though we, herewith, sign the forms with the bank our authority will begin upon your demise. We shall assist your wife in paying your investors their principal and interest as the contracts mature.” (Ex. 46.) There is no evidence that Elkinson ever submitted the necessary paperwork to his bank that would allow Ross and Fialkow to be trustees.
Between 2005 and 2009, the defendants referred numerous investors, including the Sherter family, to Elkinson, and Elkinson issued promissory notes to those investors. In face-to-face meetings, Ross and Fialkow told potential investors that they personally had invested in Elkinson, as had “Boston’s finest,” and that Elkinson paid a good interest rate. They referred interested investors to Elkinson' directly, or else gave them Elkinsoris contact information.
It is undisputed that Elkinson encouraged the defendants to bring in more investors; this, the defendants understood, was so that Elkinsoris uniform business could continue. It is also undisputed that Elkinson spoke with Ross and/or Fialkow on a regular basis. On several occasions, Elkinson complained to both Fialkow and Ross that they were not bringing in enough money, and urged them to increase their efforts. (Ex. 4, Ross depo. at 46; Ex. 3, Fialkow depo. at 60-61, 101.) At the end of each contract, Elkinson sent commission statements to the defendants which included the names of his investors.
The defendants also prepared written marketing materials, including website content and email newsletters sent to over 300 persons, explaining the business and the potential returns for investors. Of note, with respect to this action, Ross and Fialkow sent a letter (Ex. 6), undated and on Ross/Fialkow letterhead, entitled “AN ALTERNATIVE INVESTMENT TO CONSIDER” (the “investment letter”), which read as follows:
We have been engaged by a local uniform distributor to provide assistance in marketing and strategic planning. Client does business with various states and Olympic teams. Orders aire received for uniforms for state police, public works departments, and for uniforms for various Olympic teams. All uniforms are manufactured in the Pacific Rim.
Client originally financed its business with its own capital. However, as the business grew, financing was obtained from private investors. The format of the business is as follows: Orders received are forwarded to client’s associate in Japan together with a deposit for 50% of the contract amount. Upon completion and shipment of the order to the states or to the Olympic teams, the full contract price is sent directly to our client.
Funds are borrowed from investors with interest at 11.5%-13% (Banks will not finance purchase orders, hence the need for private investors). Upon receipt of the contract price from the customer, client would forward 50% to its Pacific associate less interest due the investors. At that point, the investor would have 3 options: receive principal and interest, interest only and roll over the principal to the next contract, or lastly, to “roll over” the entire amount to the next contract . . . Contracts are for periods ranging from 300-330 days. Our client has used this financing program successfully for 16 years and has never defaulted in any payment due to investors.
Should you be interested in this alternative investment, we should be pleased to introduce you to the client
JEFFREY ROSS and JAY FIALKOW
Sherter, who had been a close friend of Fialkow’s for forty years, first learned about Elkinson in the summer of 2007 during a series of conversations with Fialkow at the Spring Valley Country Club, to which they both belonged. Fialkow told Sherter that he and Ross had invested with Elkinson, and had “vetted and done due diligence necessary to establish [Elkinson’s] business as a going concern,” and one that “had been successfully operated for nearly 20 years.” (Ex. 2, Sherter depo. at 135.) He explained the nature of Elkinson’s business as he understood it, and told Sherter that Elkinson had invested $2 million of his own money, because it was a “terrific deal.”[5]
Sherter told Fialkow that he did not have personal money to invest, but that he “had some entities where I was the trustee and partner of entities that could invest, plus my daughter Amy, and that I was responsible as trustee of these entities to make sure that it was a legitimate operation in which I was investing.” (Ex. 2, Sherter depo. at 155.) Fialkow responded that it was “no problem” to recommend Elkinsoris investment to family members. Fialkow represented that Ross/Fialkow had engaged the accounting firm of Adler Blanchard & Freeman, LLP (“Adler Blanchard”) to review Elkinsoris books and records and that Adler Blanchard was “fully satisfied.”[6]
Prior to November 2007, Sherter had a meeting with Elkinson, during which Elkinson described his business and reiterated the assurances given by Fialkow. Sherter thereafter invested the following amounts with Elkinson:
On behalf of Beatrice Sherter 1989 Family Trust FBO Sidney L. Sherter (“Beatrice Sherter Trust”), a total of $115,000: $50,000 on November 24, 2007; $25,000 on September 25, 2008; $50,000 on De *101 cember 1, 2008 (rolled over principal from the November investment); $30,000 on April 5, 2009; and $10,000 on June 6, 2009;
As Trustee of the SLS Realty Trust, a total of $60,000: $50,000 on November 24, 2007; $50,000 on December 1, 2008 (rolled over principal from the November investment; and $10,000 on June 5, 2009;
As general partner of the Sherter Family Limited Partnership, a total of $70,000:
$50,000 on November 24, 2007; $50,000 on December 1,2007 (rolled over principal from the November investment); and $20,000 on April 5,2009;
As trustee of the Usen Nominee Trust, a total of $110,000 between January 5,2008, andApril5,2009;
On behalf of .Gertrude Ilsen, $50,000;
As general partner of EMS Realty Trust, $15,000; and In his individual capacity, $10,000.
Sherter purchased all the above securities, with the exception of those rolled over, by signing and mailing checks directly to Elkinson.
Sometime in 2008, Sherter sat next to Ross at a birthday party for Fialkow’s wife. Sherter testified that he “took that opportunity to get more input [about Elkinson] from another parly.” According to Sherter, Ross confirmed everything that Fialkow had told Sherter about having investigated and done due diligence on Elkinson. He told Sherter that “it was a gilded-edge investment; that he had gotten involved in it before Fialkow. He brought it then to Fialkow and then he had investigated it and it had been an ongoing situation and that they had vetted this guy and done all’ the due diligence necessary.” (Sherter depo. 179:16-19, 180:8-181:10.)
In mid-2008, Fialkow talked to Less, whom he had known since the latter’s childhood, about investing with Elkinson.[7] He told Less that he, as well as Sherter (Less’ father-in-law), had already invested, and represented that he had done due diligence on Elkinson. Less met with Elkinson that same day; Ross apparently was present at that meeting, although he did not participate. One week later, Ellkinson again met with Less, and provided Less with the details of the investment opportunity. Fialkow also told Less that “there would be a return on your money and [Elkinson] paid like clockwork.” At some undetermined time, Less had a conversation with Ross in which Ross stated that the investment “sounded like it was a good deal.”
Less thereafter invested a total of $70,000: $25,000 on June 15, 2008; $45,000 on April 5, 2009; and $25,000 on May 28, 2009 (rolled over from the June investment).
On April 5, 2009, the Jonathan Sherter IRA invested $10,000.
After discussions with both her father and her husband, and upon their recommendation and assurance that Ross/Fialkow had “vetted” Elkinson, Amy Sherter Less also invested a total of $145,000 with Elkinson: $50,000 on November 24, 2007; $25,000 on September 25, 2008; $50,000 on December 1, 2008 (rolled over principal from the November investment); $50,000 on April 5, 2008; and $20,000 on June 5, 2009.
Holden, after talking with his father-in-law and Less, invested $25,000 on November 24, 2007, and rolled over the principal on December 1, 2008.
Collectively, the plaintiffs invested a total of $714,500 with Elkinson. It is undisputed that the defendants received commissions on the plaintiffs’ investments, and that their commissions from all transactions, with these and other investors, totaled over $300,000.
There is no evidence in the record that Amy Sherter Less, Jonanthan Sherter, or Holden met with either Fialkow or Ross, or had any conversations with them or communications with Ross/Fialkow, regarding their investments with Elkinson. To the contrary, the evidence shows that Sherter represented to Fialkow that he would bring the investment opportunity to the attention of his daughter Amy, which he did during the time period at issue. Amy Sherter Less invested on the advice of her father and, later, her husband.
With the exception of the rollovers, all the above securities were purchased by check, signed by the purchaser or its agent, and sent to Elkinson directly. All the promissory notes were sent to the plaintiffs by Elkinson. The record includes three checks representing interest payments to the Beatrice Sherter Trust, Sherter Less, and Less, all signed by Elkinson.
Elkinson’s operation began to unravel in 2009, when note holders complained to Ross/Fialkow that they had not received the interest due them. By letter dated October 7, 2009, to investors, Elkinson assured them that the manufacturer would be paid $30 million in November, and that all notes, irrespective of their due date, would be paid in full after the closing with an additional 1% interest for each month the note was overdue. Elkinson appointed Ross/Fialkow as the disbursing agent and asked his investors to submit any claims to Ross/Fialkow. (Ex. 10.) On November 30, 2009, defendants sent a letter to note holders stating that they had been advised that all notes due would be paid on December 10, 2009. (Id.)
In fact, there was no Japanese uniform manufacturer, and no contract for the purchase of uniforms. No payments of any kind or checks to Elkinson’s investors were forthcoming. Because most investors had rolled over their principal and accrued interest into new promissory notes, and because promoters such as Silverman and the defendants had kept recruiting new investors, Elkin-son had been able to pay off those investors who wanted to be paid their principal and/or interest by diverting funds from other investors.
On December 24, 2009, the United States Attorney for the District of Massachusetts brought a criminal complaint against Elkinson, alleging that Elkinson had operated a classic Ponzi scheme that defrauded as many as 130 investors out of a combined total of $29 million *102 dollars. Elkinson was arrested in Mississippi on January 5, 2010, and ultimately pled guilty to eighteen counts of mail fraud for which he is serving a lengthy sentence.
On January 6, 2010, the Securities Division of the Massachusetts Secretary of State’s office investigated and brought an administrative complaint against Ross/Flalkow, Fialkow, and Ross, alleging, inter alia, that they acted as unregistered broker-dealers or unregistered agents, as well as unregistered investment advisers or unregistered investment adviser representatives, in violation of MUSA. The following day, the Securities and Exchange Commission brought a civil complaint against Elkinson in the United States District Court for the District of Massachusetts.
The plaintiffs filed their Amended Class Action Complaint on August 6, 2010.[8] They allege that the defendants acted as unregistered broker-dealers or agents when they offered to sell the notes in violation of §§410(a)(l) and 201(a) of MUSA (Count I); offered unregistered, non-exempt, and non-federally covered securities in violation of §§410(a)(l) and 301 of MUSA (Count II); offered securities by means of untrue statements of a material fact or omissions of a material fact in violation of 410(a)(2) of MUSA (Count III); aided and abetted Elkinson in the sale of unregistered securities in violation of §410(b) of MUSA (Count IV); aided and abetted Elkinson in the sale of securities by means of an untrue statement or omission of a material fact in violation of §§410(a)(2) and (b) of MUSA (CountV); and negligently misrepresented or omitted material facts in the offer and sale of securities (Count VI).
The defendants now move for summary judgment in favor of Ross on all claims brought by all plaintiffs (Counts I through VI), and in favor of all defendants on all claims brought by plaintiffs Sherter Less, Holden, and Sherter IRA (the “Sherter Less plaintiffs”) (Counts I through VI).[9] They advance five arguments in support of their motion.
That the defendants did not solicit the purchases of the promissory notes issued to the Sherter Less plaintiffs where they had no communications with those plaintiffs regarding the investment;
That the defendants did not “materially aid” in the sale of the promissory notes to the Sherter Less plaintiffs where they were merely a but-for cause of the sale and not participants in the sale itself;
That the defendants did not make any material representations to the Sherter Less plaintiffs regarding the investment;
That Ross did not offer to sell, sell, or material aid in the sale of the promissory notes to any of the defendants where the plaintiffs allege only two communications between Sherter, Less, and Ross, regarding the investment; and
That Ross made no actionable misrepresentations to Sherter or Less.
DISCUSSION
1. Summary Judgment Standard
Summary judgment is appropriate where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). “The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989).
2. The Massachusetts Uniform Securities Act
General Laws c. 110A, §410(a)(l) imposes civil liability on any person who “offers or sells a security in violation of section 201(a),” which in turn provides: “It is unlawful for any person to transact business in this commonwealth as a broker-dealer or agent unless he is registered under this chapter.” Under section 301, “It is unlawful for any person to offer or sell any security in the commonwealth unless: (1) the security is registered under this chapter; (2) the security or transaction is exempted under section 402; or (3) the security is a federal covered security.”[10]
Section 410(a)(2) imposes primary liability on any person who:
offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission
Section 410(b) of MUSA also imposes secondary liability for another person’s securities violation where a person has either aided the seller of securities or is a “control person.” Section 410(b) reads, in pertinent part:
Every person who directly or indirectly controls a seller liable under subsection (a), every partner, officer, or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
MUSA tracks its federal counterpart and seeks to serve the same purposes. Compare G.L.c. 110A, §301 with 15 U.S.C. §77e, and G.L.c. 110A, §101 with 15 U.S.C. §78(b); see also G.L.c. 110A, §415 (‘This chapter *103 shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it and to coordinate the interpretation and administration of this chapter with the related federal regulation”).
One of the cardinal purposes of the [Federal] Securities Act [of 1933] (the “1933 Securities Act”) was to slow down [the] process of rapid distribution of corporate securities, at least in its earlier and crucial stages, in order that dealers and investors might have access to, and an opportunity to consider, the disclosures of the material business and financial facts of the issuer provided in registration statements and prospectuses.
In the Matter of Carl M. Loeb, Rhoades & Co., 38 S.E.C. 843, 848 (1959). “The overarching strategy of the 1933 act was to protect investors by requiring the disclosures that were necessary for informed decision-making. ” Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 460 Mass. 647, 652 (2011) (Bulldog II}.
It is undisputed both that none of the defendants was registered as a broker-dealer or agent as required by §201(a), and that the promissory notes were not registered as required by §301. To prevail under §410(a)(1), then, the plaintiffs must show only that the defendants were “sellers” as that term is understood under MUSA.
To prevail under §410(a) (2), the plaintiffs must “establish that (1) the defendant ‘offer[ed] or [sold] a security’; (2) in Massachusetts; (3) by making ‘any untrue statement of a material fact’ or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or ‘in the exercise of reasonable care [would] have known,’ of the untruth or omission.”[11] Marram v. Kobrick Offshore Funds, Ltd., 442 Mass 43, 52 (2004) (footnote omitted), quoting G.L.c. 110A, §410(a)(2). “A fact is material... if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.” Hutchison v. Deutsche Bank Sec., Inc., 647 F.3d 479, 485 (2nd Cir. 2011).
To prevail under §410(b), the plaintiffs must prove that the defendants either “controlled” a seller who violated the Act, or “materially aided” the seller in making a sale that violated the Act.
3. The Sherter Less Plaintiffs’ Claims Against Fialkow and Ross/Fialkow[12]
A. Primary Liability (Counts I, II, and III)
The question posed by the defendants’ challenge to Counts I, n and in with respect to the Sherter Less plaintiffs is whether Fialkow and Ross/Fialkow qualify as sellers under MUSA and could therefore be primarily liable to these buyers without having had any direct communication with them. If a jury could find that Fialkow and Ross/Fialkow solicited the Sherter Less plaintiffs’ purchase of the notes, summary judgment cannot be granted.[13]
In furtherance of their statutory objectives, both the federal 1933 Securities Act and MUSA define “offer” •broadly as “every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value.” 15 U.S.C. 77a(3); G.L.c. 110A, §401(i)(2). Federal case law and SEC decisions have made it clear that an offer extends beyond the common-law contract concept, to include publicity efforts intended to arouse public interest. Carl M. Loeb, Rhoades & Co., 38 S.E.C. at 850; SEC v. Cavanaugh, 155 F.3d 129, 135 (2d Cir. 1998); Hocking v. Dubois, 885 F.2d 1449, 1457-58 (9th Cir. 1989) (“it is worth noting that the term ‘offer’ has a different and far broader meaning in securities law than in contract law”). The same principles apply in a MUSA claim. Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 460 Mass. 647, 653 (2011).
The United States Supreme Court has held that liability is not limited to those who actually pass title to the purchaser. Pinter v. Dahl, 486 U.S. 622, 645 (1988, see also Shaw v. Digital Equip. Corp., 82 F. 3d 1194, 1215 (1st Cir. 1996), abrogated on other grounds as recognized in Greebel v. FTP Software, Inc., 194 F.3d 185 (1st Cir. 1999).[14] Nonetheless, a remote involvement in a sales transaction or mere participation in soliciting the purchase does not subject a defendant to primary liability, nor does involvement in the preparation of a prospectus or offering materials. Id. at 1215-16. The Shaw court noted that the holding in Pinter limited the imposition of primary liability to the buyer’s immediate seller, precluding recovery from a seller’s seller. Id. at 1215. It is not enough, under Pinter, to prove that a defendant was the “but-for” cause of a plaintiffs purchase of a security. Id. “A defendant must be directly involved in the actual solicitation of a securities purchase in order to qualify ... as a seller.” Id.
That said, the court in Pinter noted that civil liability may be imposed on one who acts as a broker or agent of the seller; that is, one who solicits the plaintiffs purchase of the securities.
The solicitation of a buyer is perhaps the most critical stage of the selling transaction. It is the first stage of a traditional securities sale to involve the buyer, and it is directed at producing the sale. In addition, brokers and other solicitors are well positioned to control the flow of information to a potential purchaser, and, in fact, such persons are the participants jn the selling transaction who most often disseminate material information to investors. Thus, solicitation is the stage at which an investor is most likely to be injured, that is, by being persuaded to purchase securities without full and fair information.
Id. at 646. The court held that the term “seller” includes one “who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner.” 486 U.S. at 647. “If he had such motivation, it is fair to say that the buyer ‘purchased’ the security from him and to align him with the owner ...” Id. The “purchase from” requirement “focuses the inquiry on the relationship between the purchaser and the participant, rather than on the latter’s *104 degree of involvement in the transaction.” In re Craftmatic Sec. Litig., 890 F.2d 628, 636 (3rd Cir. 1990).
Other courts have come to a similar conclusion. In In re Trade Partners, Inc. Investors Litig., the United States District Court for the Western District of Michigan defined a seller as one who “urged prospective purchasers to buy. ” 2008 WL 3875396 at *20 (Aug. 15, 2008 W.D.Mich.), citing Smith v. American Nat’s Bank & Trust Co., 982 F.2d 936, 941 (6th Cir. 1992). See also Adams v. Hyannis Harborview, Inc., 838F.Sup. 676,686-87 (D.Mass. 1993), where the United States District Court for the District of Massachusetts found that a real estate broker and his agents and partner were sellers under MUSA because they solicited buyers for condominium units and received commissions on the sale of each unit. The Securities and Exchange Commission (SEC), in “No Action” letters to market participants, has found transaction-based fee arrangements to be “key factors” in determining whether a person is a broker-dealer such that registration is required. Indus Partners, LLC v. Intelligroup, Inc., 77 Mass.App.Ct. 793, 798-800 (2010).[15]
That Fialkow did not solicit the Sherter Less plaintiffs by direct communications does not absolve him of seller liability. A reasonable juiy could find that Shelter’s promotional efforts vis-a-vis his family were made at the behest of Fialkow; that the only information that Sherter (and Less) passed on was provided by Fialkow, both orally and in various marketing materials; and that Sherter took no action that was not contemplated and authorized by Fialkow.[16] See, e.g., Capri v. Gates Eng’g Co., 856 F.2d 473, 478 (2d Cir. 1988) (relying on Pinter); Boland v. Hammond, 144 OhioApp.3d 89, 94 (2001) (defendant liable as seller where he “spread the word” about investment opportunities even though plaintiff/investors learned of them from a third pariy); In re American Bank Note Holographies, Inc. Securities litigation, 93 F.Sup.2d 424, 439 n.4 (S.D.N.Y. 2000) (requirement that defendant personally solicit plaintiff not absolute where significant involvement in the solicitation is found); Commonwealth v. David, 365 Mass. 47, 52 (1974)[17] (where “the defendant played a key role in each of the transactions, whether he offered the stock to the purchaser personally or operated through an intermediary, he was liable as a seller)”; and Ecclesiastes 11:1 (“Cast thy bread upon the waters: for thou shalt find it after many days”). A factfinder could reasonably conclude that, given his close connection with the Sherter family, Fialkow intended Sherter to persuade other family members to invest in Elkinson’s business, and was confident that he would do so.
Finally, there is the important fact that Fialkow stood to, and did, gain financially from the Sherter Less plaintiffs’ investments by way of a “transaction-based compensation arrangement.” Indus Partners, 77 Mass.App.Ct. at 801. Itis undisputed (except on semantic grounds; see footnote 4) that Ross/Fialkow received commissions on sales and expected to receive additional commissions once the outstanding notes became due.[18] Such an arrangement, coupled with active solicitation of additional funds for Elkinson and recommendations as to the investment, support the conclusion that the defendants were sellers under MUSA, even with respect to Sherter family members whom they solicited only indirectly, through Sherter. Id.[19]
Hence there are factual questions as to whether Fialkow and Ross/Fialkow “successfully solicit(ed) the purchase motivated at least in part by a desire to serve [their] own financial interests or those of the securities owner, ” and thus qualified as sellers under MUSA. Pinter, 486 U.S. at 647. Fialkow and Ross/Fialkow’s motion for summary judgment against the Sherter Less plaintiffs is therefore denied as to Counts I and II.
As to Count III, the plaintiffs must “establish that (1) the defendant ‘offer[ed] or [sold] a security’; (2) in Massachusetts; (3) by making ‘any untrue statement of a material fact’ or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or ‘in the exercise of reasonable care [would] have known,’ of the untruth or omission.” Marram v. Kobrick Offshore Funds, Ltd, 442 Mass 43, 52 (2004) (footnote omitted), quoting G.L.c. 110A §410(a)(2). “A fact is material... if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act.” Hutchison v. Deutsche Bank Sec., Inc., 647 F.3d 479, 485 (2d Cir. 2011).
The relevant question is not whether a reasonable investor would have declined the transaction if the truth were known, but rather whether the reasonable investor would have considered the information important in reaching his decision. J.C. Long, 12A BLUE SKY LAW, §9:24 (2003). The “overarching strategy” of the securities laws is “to protect investors by requiring the disclosures that were necessary for informed decision-making.” Bulldog Investors Gen. Partnership v. Secretary of the Commonwealth, 460 Mass. 647, 652 (2011).
Here, the plaintiffs have offered evidence that Fialkow and Ross/Fialkow made untrue statements, orally and in the investment letter, regarding both the nature of Elkinson’s business and their own exercise of “due diligence.” It is undisputed that Elkinson’s business was a sham. As both the statute and the Marram decision elsewhere make clear, once the buyer has proved a false statement or omission of a material fact, it is the seller who must shoulder the “heavy burden” of proving that it neither knew nor should have known the truth of the matter. Marram, 442 Mass, at 52, citing G.L.c. 110A, §410(a)(2), and J.C. Long,' 12A BLUE SKY LAW, §9:23 at 9-35 (defendant held to an “inverse negligence standard” that is “a very difficult defense to sustain”). Should a jury find that Fialkow and Ross/Fialkow were sellers under MUSA, they could also find that they made material representations regarding Elkinson’s operation that the plaintiffs considered in deciding to buy the notes. It would then be those defendants’ burden at trial to prove that they did not know and could not have known that Elkinson’s business did not exist.
*105 As to the plaintiffs’ claims that Fialkow and Ross/Fialkow falsely stated that they had “vetted” Elkin-son and done all necessary and appropriate “due diligence,” again if a jury concludes that Fialkow and Ross/Fialkow are sellers and made this representation, then the burden shifts to those defendants to show that they could not have known that their statements were untrue. In other words, they must prove that their investigations into Elkinson’s business were sufficient to the task at hand.[20] Fialkow and Ross/Fialkow’s motion for summary judgment against the Sherter Less plaintiffs is therefore denied as to Count III.
B. Secondary Liability (Counts IV and V)
■ There is no dispute as to Elkinson’s primary liability. With respect to Fialkow’s and Ross-Fialkow’s secondary “materially aiding” liability, the inquiry is not whether their actions were essential to Elkinson’s sale of the investments to the Sherter Less plaintiffs, but rather whether their contribution was significant in making the sale possible. See, e.g., Prince v. Brydon, 764 P.2d 1370, 1371 (Or. 1988). As the Prince court stated:
Whether one’s assistance in the sale is “material” does not depend on one’s knowledge of the facts that make it unlawful; it depends on the importance of one’s personal contribution to the transaction. Typing, reproducing, and delivering sales documents may all be essential to a sale, but they could be performed by anyone; it is a drafter’s knowledge, judgment, and assertions reflected in the contents of the documents that are “material” to the sale.
Id.[21]
The sweep of §410(b), interpreted in light of its federal analog, is broad; it imposes potential liability on five classes of persons including, relevant here, broker-dealers or agents of the seller. There is no requirement that to be secondarily liable a defendant must be a seller, or have direct contact with a purchaser, or even that he participate in a misrepresentation; a plaintiff must show only that the defendant materially aided, or personally participated in. the sale. As one commentator has stated:
The second clause [of Uniform Act §410(b)] provides that the identified defendants will be “also liable jointly and severally with and to the same extent as the seller.” Many secondary defendants will try to escape liability by arguing that they did not make any material misrepresentations or omissions, were not present when any such misrepresentations or omissions were made, and had no personal contact with the purchaser. All these claims, even if true, are irrelevant. The quoted language does not talk about making misrepresentations or omissions or having any contact with the investor. Instead, liability is imposed on these defendants for the acts of the primary violator. . . [T]his is vicarious liability, and it is not necessary to prove direct unlawful activities by the secondary defendant to impose liability here.
J.C. Long, 12A BLUE SKY LAW, §9:78 (emphasis in original).
“(P)roof of direct unlawful activity by a defendant,” therefore, “is not essential to establish its liability as a ... material aider.” Mann v. Laurent, 229 F.Sup.2d 1133, 1138 (D.Or. 2002) (citations omitted) (holding that under Oregon law defendant’s participation in meetings, phone calls, and document preparation, all in aid of sale, was enough for secondary liability even without any allegation that he participated in fraud). See Retirement Program for Employees of Town ofFaüfiéld v. Madqff, 2011 WL 7095186 at *9 (Conn.Super., December 29, 2011) (language of Connecticut Uniform Securities Act does not require that the defendant be shown to have committed a harm directed towards the plaintiffs specifically, but “specifically sweeps into its list of proscribed behaviors those who ‘materially assist’ others in violating the securities laws”); Oster v. Kieschner, 77 A.D.3d 51, 59 (N.Y. 2010) (preparer of private placement memorandum may be secondarily liable even absent contact with any purchaser); Prince, 764 P.2d at 1371-72 (finding that a lawyer who prepared an offering statement for the sale of securities “materially aided” the issuer in the sale under Oregon’s version of §410(b)); Sterling Trust Co. v. Adderly, 168 S.W.3d 835, 843 (Tex.Sup.Ct. 2005) (person who materially aids seller need not have had any contact with purchaser).[22]
Here, there is evidence that Fialkow and Ross/Fialkow, over a four-year period, brought in multiple new investors and facilitated the roll-over of investments by existing investors. Between 2006 and 2009 they drafted and/or sent several letters describing and recommending Elkinson to potential investors and posted information about this “opportuniiy” on their website.[23] (See Ex. 6, 42, 47, 48, 49 and 50.) “What constitutes participation or aid—in any way—in making a sale of securities cannot be determined by a fixed rule of law. Each case must be determined upon its own facts.” Schollmeyer v. Saxowsky, 211 N.W.2d 377, 387 (N.D. 1973). Like many nuanced and mixed questions of fact and law, this one cannot always be answered at the summary judgment stage. See, e.g., J.C. Long, 12ABLUE SKY LAW, §9:93 and cases cited.
In this case, there is trial-worthy evidence that Fialkow and Ross/Fialkow materially aided EUkinson’s scheme. If the plaintiffs prove this at trial, the burden will shift to the defendants to prove that they did not know, and in the exercise of reasonable care could not have known, that Elkinson’s operation was a Ponzi scheme. Counts IV and V will thus stand for trial.
C. Negligent Misrepresentation (Count VI)
To succeed on their common-law claim of negligent misrepresentation, the plaintiffs must show that the defendants (1) in the course of their business; (2) supplied false information for the guidance of others; (3) in their business transactions; (3) causing loss; (4) as a result of their justifiable reliance upon the information; and (5) with failure to exercise reasonable care or competence in *106 obtaining and communicating that information. Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct. 15, 19-20 (1998). A claim for negligent misrepresentation is ordinarily one for the jury. Id. at 20. In contrast to the statutory claim under section 410(b), the plaintiffs must prove negligence, but they need not prove that the defendants actually knew the representations were false, or intended to deceive the plaintiffs. Kitnerv. CTWTransport, Inc, 53 Mass.App.Ct. 741, 749 (2002).
There is no requirement that defendants have actual knowledge of reliance by identified third parties. The Supreme Judicial Court has specifically adopted the reasoning of the Restatement (Second) of Torts, §552 (1977). Nycal Corp. v. KPMG Peat Marwick, LLP, 426 Mass. 491, 496-99 (1998). The Restatement explains that a defendant could be liable for losses suffered by those persons or persons that the defendants knew might reasonably be expected, sooner or later, to have access to the misleading information and to take some action, at some point, in reliance upon it. Id. at 497, quoting Restatement (Second) of Torts, comment h at 132-33. It is enough that the defendants supply the information for repetition to a group of persons, and that the plaintiff proves to be one of that group, even though the defendants never heard of the plaintiff when the information was given. Id. Thus a defendant may be liable for negligent misrepresentation that goes beyond particular transactions that he knowingly intended to influence, to extend to substantially similar transactions. See, e.g., North American Specialty Ins. Co. v. Lapalme, 258 F.3d 35, 39-40 (1st Cir. 2001).
Here, it is undisputed that Fialkow and Ross/Fialkow made various representations, in both oral conversations and written materials, to Sherter and Less regarding Elkinson’s business and their exercise of due diligence that turned out to be false. It is also undisputed that the defendants failed to disclose that they were acting as unregistered broker-dealers or that the securities were unregistered.
Fialkow had known the Sherter family for many years, had introduced Less to Amy Sherter, and knew that Sherter intended to recommend the Elkinson investment to family members. A factfinder could reasonably infer from this that Fialkow would expect that the Sherter Less plaintiffs would receive, trust, and rely on the information and recommendations that he conveyed to Sherter and to Less.[24] A reasonable factfinder could also find that the plaintiffs would not have bought the notes had they known of the defendants’ misrepresentations and omissions.
There is also evidence in the record from which a jury could determine that Fialkow and Ross/Fialkow failed to exercise reasonable care and competence in obtaining the information they passed on to Sherter and Less. See, e.g., Reisman v. KPMG Peat Marwick, 57 Mass.App.Ct. 100, 122 (2003). Silverman himself had raised the issue of a Ponzi scheme in his October 2005 letter, when he noted that potential investors might see the high rate of interest as a red flag with respect to Elkinson’s investment. Although he reassured the defendants on the point, a juiy need not be as accepting of Silverman’s word as the defendants apparently were, and could reasonably conclude that further inquiry was in order. Factual questions therefore remain regarding the care exercised by the defendants in communicating information about Elkinson’s business, the Sherter Less plaintiffs’ justifiable reliance upon that information, and Fialkow and Ross/Fialkow’s knowledge of that reliance, precluding summary judgment on Count VI.
4. The Plaintiffs’ Claims against Ross
A. Primary Liability (Counts I, II, and III)
The evidence supporting the plaintiffs’ claims for primary liability against Ross is less robust than that against Fialkow, but it is enough. He had one conversation with Sherter (at a birthday party) at which Sherter brought up the subject, and Ross endorsed what Fialkow had already told him: that the Elkinson notes were “a gilded-edge investment; that he had gotten involved in it before Fialkow . . . and had done all the due diligence necessary.” He had a second conversation on an undetermined date with Less, who recalled that Ross told him the investment “sounded like it was a good deal.” Ross’s name along with Fialkow’s appeared at the bottom of the investment letter, which both men clearly intended to be used as a solicitation. As a principal in Ross/Fialkow, he shared equally with Fialkow in the commissions generated by the Sherter family’s investments. Finally, as with Fialkow’s statements, a factfinder could reasonably conclude that Ross expected and intended that his assurances to Sherter would be repeated to other family members and would thereby attract additional investments. This evidence, if credited, would support a finding that Ross was “directly involved in the actual solicitation of a securities purchase” so as to “qualify... as a seller.” Pinter at 1215. Summary judgment is therefore denied as to Ross on Counts I, II, and III.
B. Secondary Liability (Counts IV and V)
The same is true with respect to the plaintiffs’ claims of secondary liability. For the purposes of this motion, secondary liability under MUSA applies to (1) all persons who control a seller, either directly or indirectly; (2) all partners, if the seller is a partnership; and (3) all broker-dealers or agents who materially aid in the sale. G.L.c. 110A, §410(b).
With respect to the third category, the evidence would support a finding that Ross—irrespective of his status as a statutory seller—materially aided Elkinson and/or Fialkow and Ross/Fialkow in the sale of the promissory notes, and that he controlled Ross/Fialkow. Ross protests, however, that as a limited partner, he is immune from liability. The argument mistakes the rules laid down in both the Partnership Act and MUSA.
Although the partners in a limited liability partnership are generally free of from vicarious liability “for debts, obligations and liabilities of or chargeable to [the] partnership, whether in tort, contract or other *107 wise ...” this provision “[does] not affect . . . the liability of a partner in a registered limited liability partnership arising in whole or in part from such partner’s own negligence, wrongful acts, errors or omissions.” G.L.c. 108A, §15(2)-(3). To the extent that Ross himself materially aided in the sale, then, his status as a limited partner does not shield him.
MUSA’s section 410(b), moreover, imposes liability based on status—including status as a partner—as well as conduct. How, .then, to reconcile this with the protections granted limited partners in a different statute? One commentator has suggested the following:
It should be noted that no distinction is made in the statutory [Uniform Securities Act] language between general and limited partners or between inside and outside directors. It is believed that this represents a conscious decision on the part of the draftsmen. The statute merely imposes potential liability on these groups. In turn, members of the group may escape liability by establishing their affirmative defense. It is believed that the draftsmen of the Uniform Act intended to put both limited partners and outside directors to the test of establishing such defense to escape liability. In the case of the limited partner who does not participate in the management of the partnership, it should be a fairly easy defense to establish. On the other hand, outside directors will have a much more difficult time establishing the defense because they have a duty to participate in management and. learn what the corporation is doing.
J.C. Long, 12A BLUE SKY LAW §9:86 (emphasis added).
In short: a partner’s liability under the first several clauses of section 410 (b) flows not from equity ownership in the seller (as it might in the case of a general partnership), but from control of the seller. See, e.g., Kirchqffv. Selby, 703 N.E.2d 644, 651 (Ind. 1998) (interpreting the identical Indiana Blue Sky Law, which “does not require a partner, officer, director or controlling person to materially aid a violation to be liable”), and cases cited. The evidence here would support a finding that Ross actively participated in the management of Ross/Fialkow—in-cluding its promotion of Elkinson and his promissory notes—and so is liable to the extent the firm is liable.
What, exactly, constitutes “control” has been the subject of discussion, and of imperfect agreement, among the federal circuits interpreting Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78(t)(a).[25] See, e.g., Lustgraqf v. Behrens, 619 F.3d 867, 877-78 (8th Cir. 2010), citing cases. The unresolved issue is whether section 78t requires a showing of “culpable participation” by the defendant in the violation, or just that the control person “possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated.” Id. at 873. For present purposes, it is enough to note that the issue of control is one of fact, In re Cabletron Sys., Inc., 311 F.3d 11, 41 (1st Cir. 2002), and that the evidence here would support a finding of control liability on Ross’s part under either standard (though more clearly under the second). Assuming that evidence is credited at trial, Ross will have the burden of proving “that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.” Summary judgment in favor of Ross is therefore inappropriate as to Counts IV and V.
C. Negligent Misrepresentation (Count VI)
The plaintiffs’ claim against Ross for negligent misrepresentation also survives summary judgment. His remark to Less that Elkinson “seemed like a good investment” might be dismissed as an opinion genuinely held and/or as puffery or “seller’s talk,” but his statements to Sherter—especially, the representation that he and Fialkow had “vetted” and done “all the due diligence necessary” on Elkinson, implying superior knowledge of the investment’s “gilded-edged” qualities—would carry the negligent misrepresentation claim to the jury, as would the factual—and as-certainably false—statements in the investment letter about Elkinson’s phantom uniform business.
ORDER
For the forgoing reasons, the defendants’ Motion for Summary Judgment is DENIED.

Over time, Ross and his family invested at least $815,000; Fialkow and his family, at least $870,000.

In addition to locating investors, the defendants provided “strategic consulting” to Elkinson. It is unclear what responsibilities fall within the rubric of “strategic consulting."

The defendants repeatedly object to characterizing the percentage paid to them as “commissions,” preferring the term “finders’ fees." It is undisputed, however, that Elkinson paid the defendants a transaction-based percentage of each investment that was in direct proportion to the amount of that investment. MUSA does not define the term, but what was paid here were “commissions” according to ordinary English usage; i.e., “an amount of money, typically a set percentage of the value involved, paid to an agent in a commercial transaction.” THE NEW OXFORD AMERICAN COLLEGE DICTIONARY (2002).

According to Sherter, Fialkow reiterated on at least two other occasions that the defendants had done “due diligence” and “vetted” Elkinson’s business.

Two emails, dated October 7, 2008 and March 3, 2009, include Ross/Fialkow’s representation that Adler Blanchard had reviewed Elkinson’s “systems, contracts, etc., to verify his record keeping for accuracy of the loan program. The examination was completed and the firm is fully satisfied that all books and records are accurate, timely and reliable.” Exh. 42. The plaintiffs do not allege that they received those emails; they assert, however, that the defendants made essentially the same representations to them orally. The information was also available on Ross/Fialkow’s website. Ross and Fialkow *108 have since admitted that Adler Blanchard did not do a full review of Elkinson’s books and records; they assert, however, that Adler Blanchard represented that it had done so.

Apparently Fialkow had introduced Less to Amy Sherter.

See n.l, supra.

The defendants do not seek summary judgment on so much of the complaint as asserts claims on behalf of the remaining plaintiffs against Fialkow and Ross/Fialkow.

There is no dispute here that the promissory notes were unregistered securities under §301. See, e.g., Reves v. Ernst & Young, 494 U.S. 56, 63-64 (1990) (rebuttable presumption that a note with a maturity of over nine months is a security unless it bears a “strong family resemblance” to a judicially crafted list of exceptions). See also Adams v. Hyannis Harborview, Inc., 838 F.Sup. 676, 685 (D.Mass. 1993), citing Rodriguez v. Banco Central Corp., 990 F.2d 7, 10 (1st Cir. 1993) (defining security as an “interest in a ‘common enterprise’ that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either for direct distribution or as an increase in the value of the investment”).

 As both the statute and the Marram decision elsewhere make clear, once the buyer has proved a false statement or omission of a material fact, it is the seller who must shoulder the “heavy burden” of proving that it neither knew nor should have known the truth of the matter. Marram at 52, citing G.L.c. 110A, §410(a)(2), and J.C. Long, BLUE SKY LAW, §9:23 at 9-35 (2003) (defendant held to an “inverse negligence standard" that is “a very difficult defense to sustain”).

Ross has moved for summary judgment as to all claims against him by all defendants; his motion is addressed below. The analysis of the Sherter Less plaintiffs’ claims will therefore be limited, for the time being, to the liability of Fialkow and Ross/Fialkow.

It is immaterial whether the defendants acted as unregistered broker-dealers in violation ofG.L.c. 110A, §§410(a)(l) and 201(a), or as sellers of unregistered securities in violation of under §§410(a)(l) and 301. Where they realized financial gain, “brokers and other agents of the seller are considered ‘sellers’ under the securities laws.” Adams v. Hyannis Harborview, Inc., 838 F.Sup. 676, 686 (D.Mass. 1993). See also Pinter v. Dahl, 486 U.S. 622, 644-46 (1988); In re Chaus Securities Litigation, 1990 WL 188921 (S.D.N.Y., November 20, 1990) (defendants liable as sellers based on the promotional efforts of another, particularly where they stood to gain financially). The definition of “seller” under MUSA is identical to that under the Federal Securities Act. See, e.g., Adams, 838 F.Sup. at 686. MUSA defines a broker-dealer as “any person engaged in the business of effecting transactions in securities.” G.L.c. 110A, §401(c).

It is undisputed in this case that the defendants did not pass title to the plaintiffs.

Other factors to consider when making a determination as to whether a person effected a transaction and was thus a broker-dealer are “whether that person 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors. ” Indus Partners, LLCv. Intelligroup, Inc., 77Mass.App.Ct. 793,798 (2010), quoting Securities & Exchange Comm. v. Zubkis, No. 97 Civ. 8086, 2000 WL 218393 (S.D.N.Y. Feb. 23, 2000).

Ihe Sherter Less plaintiffs make much of the undated investment letter, asserting that, when compared to other, dated letters that are substantively the same, it was written in 2007. The defendants argue that Sherter did not read the letter until after his first investment with Elkinson, and that neither Sherter nor Sherter Less remembered when they read it. The date of the letter is a factual issue for a jury. Were a jury to determine that the defendants wrote it in 2007, they could also conclude Sherter relied on it in recommending the investment to the Sherter Less plaintiffs, at least with respect to those' investments made after 2007. In any event, the import of the investment letter is a matter to be left for the jury.

David was decided before Pinter, but nothing in Pinter would contravene the holding in David.

Exhibit 45 is a list of investors and amounts invested. In November and December 2008, and January 2009, Elkin-son paid Ross/Fialkow $1,000 on the $50,000 investments of Sherter Less, Sherter Family Trust, Beatrice Sherter, SLS RealtyTrust, and Usen Nom. Trust. (Ex. 45, atRFCP 000732.) There is no other documentary evidence of commissions paid on the Sherter Less plaintiffs investments, but Ross testified that Ross/Fialkow received, or expected to receive, commissions on all investments once it received a fee statement from Elkinson. (Ex. 4, Ross depo. at 126-30.)

Fialkow also stood to benefit, directly and personally, where additional investments kept Elkinson’s operation afloat, resulting in continued interest payments on his personal investments.

Fialkow and Ross/Fialkow argue that they never claimed to have done “due diligence,” and Fialkow testified that he would not have used the term “vetted.” Tbe short answer, for summary judgment purposes, is that there is admissible evidence from Sherter that Fialkow said they had. done this, and that “vetting” and “due diligence” are, in this context, all but synonymous. A juiy could also find that Fialkow’s and Ross/Fialkow’s assurances that Adler Blanchard had looked Elkinson’s operation over and was “fully satisfied that all books and records are accurate, timely and reliable” meant, essentially, the same thing.

In contrast to MUSA the cognate Oregon statute also imposes liability for one who “participates” in the fraudulent transaction. As the court in Prince pointed out, “participation” and “materially aidfing]” are different concepts. Prince v. Brydon, 764 P.2d 1370, 1371 (Or. 1988). The latter focuses on the importance of the defendant’s personal contribution to the sale. Id

The defendants’ reliance on In re Nat'l Century Fin. Enters, Inc. Inv. Litig, 2006 WL 2849784 at * 10 (S.D.Ohio Oct. 3, 2006), and Lohrman v. Sunset Fin. Servs., Inc., 641 F.Sup.2d 879, 887 (D.Neb. 2009), is unavailing. The courts in both cases allowed a motion to dismiss where the plaintiff had failed to allege any facts to support a claim of materially aiding in violation of the cognate state statutes.

The defendants assert that it is unclear if, or when, the Sherter Less plaintiffs received the investment letter (Ex. 6), and thus no evidence that those plaintiffs relied on its content in making their investments. The question is not whether the Sherter Less plaintiffs relied on any representations by the defendants, however, but whether those representation materially aided the sale by the primary violator.

As already noted, the timing of the investment letter and any reliance upon its content by the Sherter Less plaintiffs present factual questions for the jury.

Secüon 78t(a) is worded differently from MUSA’s section 410(b): rather than MUSA’s defense for a person who “did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist,” under section 78t there is liability “unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.” This difference could be outcome-determinative in some cases but not in this one, at least at the summary judgment stage.